Rebecca and Michael GREGG *v.* ARKANSAS
DEPARTMENT OF HUMAN SERVICES

CA 97-22 952 S.W.2d 183

Court of Appeals of Arkansas
Division III
Opinion delivered September 24, 1997

*Osmon, Chism & Ethredge, P.A.*, by: *Kerry D. Chism*, for appellant.

No response.

MARGARET MEADS, Judge. This is an appeal from an order of the Baxter County Juvenile Court granting appellee's petition for termination of parental rights. Appellant Rebecca Gregg is the natural mother of L.G., a male minor child, born August 2, 1995. Appellant Michael Gregg is the husband of Rebecca Gregg and the child's legal father.

Initially, we note with chagrin that appellee did not file a brief in this case; thus, we must rely solely on appellant's abstract and brief. In a matter of such importance as the termination of parental rights, for which the Department of Human Services has exclusive authority, we find it unconscionable that DHS elected not to file an appellee's brief.

Appellant's brief reveals that on October 3, 1995, Mrs. Gregg took L.G. to Baxter County Regional Hospital where a skeletal survey revealed multiple fractures of the collarbones, legs, forearms, and ribs. Appellee filed a petition for emergency custody which alleged that L.G. was at imminent risk and should be removed from appellants' custody. At an ex parte hearing held October 5, the court found probable cause to believe the child was dependent–neglected, ordered his immediate removal from appellants' custody, and placed him in appellee's custody. After an adjudication hearing held November 6, 1995, the court entered an order finding L.G. to be dependent–neglected and further find–

ing that L.G.'s injuries were severe and consistent with Child Maltreatment Syndrome.

On December 4, 1995, appellee filed a Petition for Termination of Parental Rights alleging that L.G. was the victim of neglect or abuse perpetrated by appellants that endangered his life. On May 10, 1996, appellee filed a Court Report for Hearing which stated in part:

> Despite their dependability and appropriate demeanor, there is still strong concern for L. G. or any child in the care of Michael and Rebecca because it was this same conduct that took place while L. G. was subjected to 18 fractures between 08/25/95 and 10/03/95. This was a period of time that Rebecca and Michael were receiving supportive services and seemed very appropriate to all workers that they had contact with and yet extreme severe physical abuse was being inflicted on a very young infant.
> . . . .
> Rebecca and Michael's attorney had advised the couple not to submit to psychiatric evaluations so our knowledge of this couples' mental makeup is limited. We do know that they present a very "normal" behavior to our workers. However, some very abnormal violent behavior took place in their home behind closed doors, with little L. G. as the victim.

After a hearing held June 17, 1996, the trial court entered an order finding appellee had proved, by clear and convincing evidence, that L.G. was a victim of neglect or abuse that could endanger his life; that L.G. sustained multiple fractures over a period of two to three weeks evidencing Battered Child Syndrome; and that these injuries were perpetrated by Rebecca "and/or" Michael Gregg. Appellants' parental rights were terminated, and appellee was authorized to consent to the adoption of the minor child without notice to or consent of appellants.

■ ■ Grounds for termination of parental rights must be proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b) (Supp. 1995). Clear and convincing evidence is that degree of proof which will produce in the factfinder a firm conviction as to the allegation to be established. *Anderson v. Douglas*, 310 Ark. 633, 839 S.W.2d 196 (1992). When the burden of proving a disputed fact is by "clear and convincing" evidence, the

question on appeal is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Freeman v. Freeman*, 20 Ark. App. 12, 722 S.W.2d 877 (1987). In resolving this question we must give due regard to the opportunity of the trial court to judge the credibility of the witnesses. *Beeson v. Arkansas Dep't of Human Servs.*, 37 Ark. App. 12, 823 S.W.2d 912 (1992). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Hardison v. Jackson*, 45 Ark. App. 49, 871 S.W.2d 410 (1994). Our case law is clear that termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents; however, parental rights will not be enforced to the detriment or destruction of the health and well being of the child. *Corley v. Arkansas Dep't of Human Servs.*, 46 Ark. App. 265, 878 S.W.2d 430 (1996).

Appellants argue the chancellor's finding that appellee proved by clear and convincing evidence that L.G. was the victim of neglect or abuse perpetrated by appellants is clearly erroneous. Appellants do not argue that the child was not abused, but only that there were other persons who had access to the child who could have inflicted the abuse.

At the June 17, 1996, hearing on appellee's petition, Dr. Perry Wilber, a pediatrician, testified that L.G. was brought into the emergency room on October 3, 1995, because he was inconsolable and would not stop crying. A skeletal survey revealed multiple fractures of the collarbones, legs, arms, and ribs that were in various stages of healing. A physical examination revealed some dime-sized brownish bruises on the lower back to the right of the spine.

Dr. Wilber testified there was no medical problem that could have caused the fractures; the history related by the mother was the child had been crying and fussy, irritable, and inconsolable unless held upright; and the emergency room record stated that the mother said "he" fell with the child two weeks prior, but the child did not start crying until Sunday. Dr. Wilber testified in detail about the fractures. He testified that the left forearm bones

were completely separated in an acute fracture, and the bones would have required a forceful injury to be cleanly broken like that; that it is unusual to find fractures above and below the knee because those are non-weight-bearing areas in a baby, and also unusual to find fractures around the ankle in non-ambulatory children; and that the blow which caused the rib injuries had to be "pretty hard," harder than the force used in doing CPR.

Dr. Wilber testified further that the injuries had occurred within the past month, since they were not present on a skeletal survey done a month previously, when L.G. was hospitalized with hemorrhages in his eyes and some peculiar hemorrhages on his fingers. Rebecca's explanation for those injuries was that L.G. rolled off the couch while in Michael's care. Dr. Wilber testified that he did not see how that could have happened, because a month-old baby does not project himself off a couch.

Based on the unexplained crying, the x-rays, and the various ages of the fractures, Dr. Wilber believed L.G. had been physically abused. He testified that he was and still is concerned about L.G., because his injuries were severe and potentially life threatening.

Dr. Robert Foster, an orthopedic surgeon, testified that L.G.'s injuries presented a classic case of child abuse, which can be life threatening; that the injuries could not have been caused accidentally; and that L.G has had no new fractures since he has been out of appellants' home.

Cheryl Munson, a caseworker for appellee, testified that she recommended terminating appellants' parental rights even though the Greggs had complied with everything she told them to do. She had a problem leaving L.G. with appellants because he had suffered over thirteen fractures during the period they were receiving services from appellee, during which time their behavior always seemed appropriate. Ms. Munson testified it was her opinion that appellants had injured the infant because Michael admitted grabbing him by the leg to keep him from dropping, tripping in the bedroom and falling on the floor with him, and leaving him on the sofa just before he fell off. She also believed appellants had injured L.G. because the health-care professionals believed that the nature of his injuries presented a classic case of child abuse. Ms.

Munson testified that L.G. was subjected to severe physical abuse while in appellants' care which was perpetrated by "one of two" people. She did not believe that Angela Rowden, a babysitter, inflicted the injuries.

Appellant Rebecca Gregg testified that L.G. had been watched by her in-laws, and by Angela Rowden and Angie Gibson. She could not say that the babysitters could not have injured L.G. She stated she had never harmed L.G.; that she did not believe Michael would intentionally hurt L.G.; and that she believed Michael accidently hurt L.G.

However, Rebecca also testified that Michael dropped L.G. and caught him by the leg, bumped L.G.'s head on the bedroom wall, and fell with L.G. She said she had told the police that she was never around when Michael had anything happen to L.G.; that she would come home sometimes and find a bruise on L.G. which neither she nor Michael could explain; and that whenever anything bad happened with L.G., she was either asleep or not at home. She said Michael is "clumsy." Rebecca testified further that she continued using Angela Rowden as a babysitter even though she thought Angela Rowden might have dropped L.G.

Appellant Michael Gregg testified that he had accidently injured L.G. when the infant "got loose from my arm" and he caught L.G.'s leg before the infant hit the floor; when he bumped L.G.'s head against the wall after picking him up to go out the door; and when he fell forward while holding L.G. He said he did not go to the hospital after falling with L.G. because the infant was able to move his arms and legs, and he did not call the doctor when he hit L.G.'s head even though it was bruised. He also testified that L.G. rolled off the couch while in his care when he left him unattended for two to four minutes. Michael had no other explanation for the fractures.

At the conclusion of the hearing, the chancellor stated that Michael Gregg had indicated four instances where something had happened to L.G. while in his custody, and the incident in which Michael fell forward could not have accounted for all of L.G.'s broken bones. It might have accounted for some of the broken ribs or leg fractures, but did not account for the difference in the

age of the injuries or for the extremities that were injured. He had never seen that kind of damage done to a child in that earliest period of its life. In terminating appellants' parental rights, the chancellor said there "has never been a decision that this Court made that the Court makes with more confidence than this one," and he could not in good conscience ever allow L.G. to return and be subjected to "this kind of unbelievable situation."

After a thorough review of the record we are not left with a definite and firm conviction that a mistake has been made. On the evidence before us, we cannot say the chancellor's findings are clearly erroneous.

Affirmed.

ROBBINS, C.J., and CRABTREE, J., agree.