Tiffany Amelia DINKINS *v.*
ARKANSAS DEPARTMENT of HUMAN SERVICES

00-1401                                      40 S.W.3d 286

Supreme Court of Arkansas
Opinion delivered March 22, 2001

*Floyd J. Taylor, Jr.,* for appellant.

*Kathy L. Hall,* for appellee.

TOM GLAZE, Justice. Tiffany Dinkins is the mother of seven children, three of whom — Khadijah, Khatiana, and Khasahn — are involved in this appeal. Dinkins's parental rights as to these three children were terminated by a chancery court order on September 8, 1999. Prior to the termination, the children had been in the custody of the Arkansas Department of Human Services ("DHS") and in foster care for nearly two-and-a-half years.

Dinkins appealed the court's order terminating her parental rights to the court of appeals, which reversed the chancellor on the grounds that the decision was not supported by clear and convincing evidence. See *Dinkins v. Arkansas Dep't of Human Servs.*, 71 Ark. App. 451, 34 S.W.3d 366 (2000). DHS has petitioned for review of that opinion, alleging that the court of appeals improperly applied the standard of review. Our jurisdiction is thus proper pursuant to Ark. Sup. Ct. R. 2-4(c)(ii), and we reverse the court of appeals and affirm the chancellor.

We begin with a review of the relevant facts. Dinkins applied for DHS assistance on March 24, 1997, when she was nine months' pregnant. At that time, Juanita Turner, a DHS employee, noticed a bruise on Khadijah's right cheek and ear; the child told Turner that Dinkins had hit her. Turner inspected Dinkins's home the next day, and found that the small two-bedroom trailer was filthy. Garbage cans were overflowing with trash and dirty diapers; the kitchen smelled of soured food, and dirty pots and pans cluttered the sink; dirty clothes and "unidentifiable debris" were found on the floor in each room. Upon examining the children, Turner saw numerous new bruises on Khadijah and Khatiana, who said their mother slapped them on the face and hit them with a stick.

On March 26, 1997, Turner took Dinkins and her children in for a physical examination. Khadijah and Khatiana had more new bruises on their chests; the children said Dinkins hit them with a belt. Although Dinkins denied causing the children's injuries, Turner concluded that the children were in substantial danger of continued maltreatment. After an *ex parte* hearing on March 31, the chancery court, juvenile division, issued an order for emergency custody, finding probable cause existed to believe that the children were dependent-neglected. As a result, the court immediately removed the children from the present custodian in order to protect their health and physical well being from danger.

A probable-cause hearing was held on April 2, 1997, and on April 22, the juvenile court entered an order, finding the children to be dependent-neglected and ordering that the children remain in the custody of DHS. Although the court found that returning the children to their mother's custody was contrary to their welfare, it directed that the goal of the case would be reunification. The court ordered Dinkins to attend mental health counseling, attend and complete parenting classes, obey the court's orders, and comply with the DHS case plan.

The court reviewed the case periodically during the next two years, while the children remained in DHS custody. From July 1997 through December of 1998, each DHS report prepared for the chancery court recommended that reunification of the family should be the goal. While those reports noted that returning the children to their mother would be contrary to their welfare, they also reflected that Dinkins was complying with the case plan.[1] However, a November 1998 report indicated that Dinkins's apartment was unkempt, that she was not working, but instead was relying on public assistance as her only source of income, and that she had recently given birth to a baby. That November report noted that Dinkins had been complying with the case plan, but DHS had concerns about her ability to support the children. On the other hand, in December of 1998, DHS recommended a period of extended unsupervised visitation in order to successfully reunite the children and their mother.

In a February 1999 report, DHS recommended Dinkins be permitted a thirty-day trial visit with her children in her home. However, at a March 1, 1999, hearing, the chancellor[2] rejected DHS's trial-visit recommendation after viewing photographs of the inside of Dinkins's home. He expressed concerns about the children's welfare and the condition of the home. The chancellor also canceled the children's weekend visits with their mother, returned custody to DHS, and ordered that future visitations be out-of-home and supervised.

At a May 11, 1999, review hearing, DHS recommended that the goal of the case be changed to termination of parental rights because the conditions that warranted the children's removal in March of 1997 had not been remedied. The chancellor found "overwhelming evidence" that termination should be the goal.[3] The petition to terminate Dinkins's parental rights was filed on May 28, 1999.

---

[1] In October 1998, DHS filed a petition to terminate Dinkins's parental rights because it understood it was required to do so under federal law. However, that petition was subsequently dismissed at DHS's request.

[2] Prior to this hearing, Judge Joe Mazzanti presided over this case. After January 1999, however, the chancellor was Judge Bynum Gibson.

[3] The May 11, 1999, order initially entered after this hearing reflected that Dinkins had not complied with the DHS case plan. However, on July 12, 1999, the court entered an amended and substituted order which recited that the court did not make a specific finding as to whether Dinkins had complied with the court's orders and the DHS case plan. Nevertheless, the goal of the case remained termination of Dinkins's parental rights.

A termination hearing was held on August 5, 1999, and at that time, evidence was presented showing Dinkins's home was still inappropriate for the children. Several DHS employees testified that, although Dinkins had made some improvements, the house was still dirty and Dinkins seemed incapable of maintaining a consistently clean environment for her children. Photographs of the apartment, taken a few weeks before the hearing, showed a number of safety hazards, as well as generally unkempt conditions. In addition, evidence showed that Dinkins had not kept a steady job during the previous two years, and she did not have an income sufficient to support all of her children.[4] Further testimony indicated that the children continued to suffer some physical abuse when they were in their mother's custody. While Dinkins's counselor testified that Dinkins had made progress in her anger management and parenting classes, other DHS workers stated that Dinkins had threatened them and continued to have problems with her anger. Dinkins herself testified that she did not want to lose her children, but conceded that she had a problem with her anger. Dinkins admitted that she had caused bruises on her daughter's face and ear, but asserted that the last time she had hit her children was before they were taken into DHS custody. Dinkins also conceded that earlier her parental rights had been terminated with respect to two other children she had in New York.

After the hearing, the chancellor entered his findings of fact on September 7, 1999. In those findings, he noted that Dinkins had "above average intelligence," but that she "cannot and will not hold a steady job despite the fact that she has the intelligence and good health to do so." The chancellor also stated that Dinkins's apartment was virtually rent-free, yet she still managed to get behind on her $1.00 a month rent. Because Dinkins "either quits or is fired" from her jobs, she did not "have the financial resources to support the two children that remain at home, much less the three children at issue here." In addition, the chancellor noted that he had viewed the photos of Dinkins's apartment, and deemed it unsuitable for any child to visit, much less live in. The findings of fact also recited that notwithstanding her job at a cleaning service and the fact that she had graduated from a vo-tech school with a certified nursing assistant's license, DHS had to provide Dinkins with a DHS worker to show her how to clean her own home.

---

[4] Dinkins gave birth to two more children since Khadijah, Khatiana, and Khasahn were taken from her custody in March of 1997.

The court found DHS's testimony about the ongoing abuse to be credible, and also found that Dinkins was "so irresponsible, impulsive and at times belligerent that she lacks the emotional discipline to ever hold a job." The chancellor concluded that "[t]o return the three children to this small three-bedroom apartment to reside with Ms. Dinkins and two more children under these circumstances would be a great disservice to the well being of [the] three children."·

In his September 7, 1999, conclusions of law, the chancellor found that DHS had shown by clear and convincing evidence that the three children, Khasahn, Khatiana and Khadijah, had been adjudicated dependent-neglected and had remained out of their mother's home continuously in excess of two years and four months. He further found that DHS had made a meaningful effort to rehabilitate the home and correct the conditions and that those conditions had not been remedied by the parent, and that, despite Dinkins's capability to hold a job, she had not done so, nor had she contributed anything to the support of her three children. The chancellor determined it would be in the children's best interests for Dinkins's parental rights to be terminated pursuant to Ark. Code Ann. § 9-27-341 (Supp. 1999).

Dinkins timely filed her notice of appeal from the chancellor's termination order, and the court of appeals considered and reversed the chancellor's crder. After reviewing the evidence, the court of appeals was "left with a definite and firm conviction that DHS has not demonstrated by clear and convincing evidence that Dinkins failed to correct the conditions that caused the children's removal." *Dinkins v. Arkansas Dep't of Human Servs*, 71 Ark. App. 451, 460, 34 S.W.3d 366 (2000). DHS petitioned us to review the court of appeals' decision.

█ Upon a petition for review, we consider a case as though it had been originally filed in this court. *Estridge v. Waste Management*, 343 Ark. 276, 33 S.W.3d 167 (2000) (citing *Maxey v. Tyson Foods, Inc.*, 341 Ark. 306, 18 S.W.3d 328 (2000); *Woodall v. Hunnicutt Construction*, 340 Ark. 377, 12 S.W.3d 630 (2000); *White v. Georgia-Pacific Corporation*, 339 Ark. 474, 6 S.W.3d 98 (1999); *Burlington Indus. v. Pickett*, 336 Ark. 515, 988 S.W.2d 3 (1999)). We hold the chancellor's decision to terminate Dinkins's parental rights must be affirmed.

█ Arkansas Code Annotated section 9-27-341(b)(3) (Supp. 1999) requires an order terminating parental rights be based upon

clear and convincing evidence. *Larscheid v. Arkansas Department of Human Services*, 343 Ark. 580, 36 S.W.3d 308 (2001) (citing *Baker v. Arkansas Dept. of Human Servs.*, 340 Ark. 42, 12 S.W.3d 201 (2000)). Our law is well settled that when the burden of proving a disputed fact in chancery court is by clear and convincing evidence, the question that must be answered on appeal is whether the chancery court's finding that the disputed fact was proven by clear and convincing evidence was clearly erroneous. *Id.* (citing *J.T. v. Arkansas Dept. of Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997); *Anderson v. Douglas*, 310 Ark. 633, 839 S.W.2d 196 (1992)). Clear and convincing evidence is that degree of proof that will produce in the fact finder a firm conviction as to the allegation sought to be established. *Id.* In resolving the clearly erroneous question, we must give due regard to the opportunity of the chancery court to judge the credibility of witnesses. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Gregg v. Arkansas Dep't of Human Servs.*, 58 Ark. App. 337, 952 S.W.2d 183 (1997). Cases such as this are reviewed *de novo* on appeal. *Wade v. Arkansas Dep't of Human Servs*, 337 Ark. 353, 990 S.W.2d 509 (1999).

In this case, the chancellor terminated Dinkins's parental rights under Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(a) (Supp. 1999), which states that an order terminating parental rights shall be based on a finding by clear and convincing evidence that a juvenile "has been adjudicated by the court to be dependent-neglected and has continued out of the home for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the home and correct the conditions [that] caused removal, those conditions have not been remedied by the parent."

██ ██ In *Baker v. Arkansas Department of Human Services*, 340 Ark. 42, 8 S.W.3d 499 (2000), this court repeated its holding that "when the issue is one involving the termination of parental rights, there is a heavy burden placed upon the party seeking to terminate the relationship." *Baker*, 340 Ark. at 48-49 (citing *J.T. v. Arkansas Dept. of Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997)). This court continued, noting that termination of parental rights is an extreme remedy and is in derogation of the natural rights of the parents. *Baker*, 340 Ark. at 48 (citing *Wade v. Arkansas Dep't of Human Servs.*, 337 Ark. 353, 990 S.W.2d 509 (1999)). However, the court recognized in *J. T. v. Arkansas Dep't of Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997), that parental rights should not be allowed to continue to the detriment of the child's welfare and best

interest. To illustrate that the best interest of the child is the primary consideration in these cases, this court in *J.T.* stated:

> While we agree that the rights of natural parents are not to be passed over lightly, these rights must give way to the best interest of the child when the natural parents seriously fail to provide reasonable care for their minor children. Parental rights will not be enforced to the detriment or destruction of the health and well-being of the child.

*J.T.*, 329 Ark. at 248.

The purpose of the termination–of–parental–rights statutes is set forth in Ark. Code Ann. § 9-27-341(a)(3) (Supp. 1999), which provides as follows:

> The intent of this section is to provide permanency in a juvenile's life in all instances where the return of a juvenile to the family home is contrary to the juvenile's health, safety, or welfare and it appears from the evidence that a return to the family home cannot be accomplished in a reasonable period of time, as viewed from the juvenile's perspective.

*See Moore v. Arkansas Department of Human Services*, 69 Ark. App. 1, 9 S.W.3d 531 (2000) (where the mother had failed to provide a home and adequately demonstrate the ability to parent her children after receiving rehabilitative services for three years, the chancellor's decision to terminate parental rights was not clearly erroneous).[5]

In the instant case, Dinkins's case plan required her to maintain a stable home and acquire a job; although she kept the same apartment from October of 1997 until the termination hearing, she was threatened with eviction several times, and she failed to keep a job. Her children had been out of the home for over two years, and although she had complied with part of her case plan, she had not managed to consistently maintain her home in a sanitary condition or to acquire a steady job which would have enabled her to provide

---

[5] Under Ark. Code Ann. § 9-27-338 (Supp. 1999), a permanency planning hearing must be held no later than twelve months after the juvenile enters an out-of-home placement. At this time, the chancellor must enter a disposition that (1) returns the juvenile to the parent; (2) authorizes a plan for termination of the parent–child relationship; (3) places the juvenile in long-term foster care; or (4) allows the juvenile to continue in an out-of-home placement for a specified limited period of time. *See Arkansas Dep't of Human Servs. v. Farris*, 309 Ark. 575, 832 S.W.2d 482 (1992).

for her children. In addition, evidence was presented at the termination hearing that the physical abuse of the children had not ended.

██ This court gives a high degree of deference to the chancellor, who is in a far superior position to observe the parties before him. *See Davis v. Office of Child Support Enforcement*, 341 Ark. 349, 20 S.W.3d 273 (2000). Here, although there were inconsistences in the testimony presented at the termination hearing,[6] the resolution of those inconsistencies was best left to the chancellor, who heard and observed these witnesses first-hand. Given our deferential standard of review, we cannot say that we are "left with a definite and firm conviction that a mistake has been made." *Gregg, supra.* After reviewing the evidence in this case, the chancellor concluded that there was clear and convincing evidence to support an order terminating Dinkins's parental rights. We cannot say that his decision was clearly erroneous.

██ In her appeal, Dinkins also argued that the chancellor erred in finding that she had not discharged or met her child support obligations and, as such, had failed to provide significant material support for the children. Under Ark. Code Ann. § 9-27-341(b)(3)(B)(ii)(A) (Supp. 1999), the failure to provide material support is another ground for terminating parental rights. The chancellor, however, did not find that Dinkins has "willfully" failed to provide support; DHS concedes that it never requested contributions of material support from Dinkins, nor did the trial court ever order her to pay child support. Therefore, it was error for the chancellor to conclude that Dinkins's failure to provide support constituted an additional ground on which to base the termination of her parental rights. Nonetheless, this error does not warrant reversal, because when a chancellor reaches the proper result, albeit for an incorrect reason, this court can still affirm. *See Malone v. Malone*, 338 Ark. 20, 991 S.W.2d 546 (1999).

We conclude by emphasizing that this case has gone on for nearly four years. Two-and-a-half years elapsed from the time DHS took custody of these children in March of 1997 until the time the court terminated Dinkins's parental rights in September of 1999. It

---

[6] For example, Juanita Turner testified about a burn she had seen on one of the girls; the child who had been burned testified that her mother did not inflict the burn on purpose, despite her earlier statement that the act had been intentional. In addition, Dinkins and her counselor both noted that she had made improvements with her anger management, but several of the caseworkers testified that Dinkins had threatened them.

is now March of 2001. The emergency clause preceding the 1997 amendments to the Juvenile Code stated one of the purposes of our statutes is to "insure the best interests of Arkansas' children in achieving a safe and permanent home." The court's review and conclusion of this case is long overdue, especially in light of the convincing evidence that Dinkins failed to remedy the serious problems that caused her children to be removed from her custody and placed with DHS almost four years ago. Thus, because the trial court's order terminating Dinkins's parental rights is not clearly erroneous, we affirm. The court of appeals' decision is reversed on petition for review.