2012 Ark. App. 480

**Fiapopo APELU, Appellant**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES & Minor Child, Appellees.**

**No. CA 12–282.**

Court of Appeals of Arkansas.

Sept. 12, 2012.

Leah Lanford, Arkansas Public Defender Commission, for appellant.

Tabitha McNulty, Office of Chief Counsel, for appellee Arkansas Department of Human Services.

Bristow & Richardson, PLLC, by: Melissa B. Richardson, attorney ad litem for minor child.

DAVID M. GLOVER, Judge.

Fiapopo Apelu appeals the termination of parental rights to her daughter, R.W. (DOB 6–18–10). On appeal, she argues that there was insufficient evidence that it was in R.W.'s best interest for her parental rights to be terminated—specifically, that the trial court erred in finding that there was a potential for harm if R.W. was returned to her custody—and that there was also insufficient evidence to support any of the grounds upon which the trial court terminated her parental rights. We affirm the termination of Apelu's parental rights.

*Background*

In the early morning hours of September 12, 2010, according to a DHS affidavit of facts for a petition for ex parte emergency custody, R.W. was taken to Arkansas Children's Hospital by Rory Williams, her father (Apelu's boyfriend). Her injury was later determined to be a spiral fracture of her left arm, which was consistent with suspected abuse. Apelu did not accompany Williams and R.W. to the hospital, and Williams left R.W. at the hospital. By 6:30 that night, no one had contacted the hospital to inquire about R.W.'s condition, and all of the telephone numbers given by Williams were nonworking numbers. When Williams finally contacted the DHS worker, his explanation for why he and Apelu had not been to the hospital was because they were both working; however, it was later learned that neither Williams nor Apelu were employed at the time.

Williams initially reported to the hospital that R.W. had fallen off the bed at his mother's house; however, upon investigation, Williams's mother denied this, stating

that she had not seen R.W., her granddaughter, in a month. Williams then reported to his mother that he had dropped R.W. while he was showering with her. When the DHS assessor spoke with Apelu, Apelu backed Williams's initial story of how the injury occurred, telling the assessor that R.W.'s arm was not broken when the child went to Williams's mother's house. The assessor was unable to get a "true" statement as to how R.W. received a fractured arm, as the family's explanation of R.W.'s injuries was not credible, and the medical information was that the injuries were consistent with abuse. Apelu said that she did not initially go to the hospital because she stayed at home with her two-year-old son, who was asleep at the time. Her explanation for not arriving at the hospital until almost 9 p.m. was that she had to go to the store.

### Court Proceedings

DHS took a seventy-two-hour hold on R.W. and her older half-brother, F.I.[1] An order granting emergency custody to DHS was entered on September 15, 2010, and a probable-cause order was entered on September 26, 2010. Apelu and Williams were ordered to submit to psychological evaluations as well as random drug-and-alcohol screens. An amended probable-cause order was filed on October 12, 2010, adding the provision that there was to be no placement with a relative without an order of the court.

Apelu underwent her psychological evaluation in October 2010 with Dr. Paul Deyoub, who diagnosed her with adjustment disorder with depressed mood and personality disorder. Williams was in prison at this time for a parole violation. In his summary and recommendations, Dr. Deyoub noted that Williams lied to hospital staff about how R.W.'s injury occurred, first implicating his own mother and convincing Apelu to go along with his initial story; that Apelu then went along with Williams's second story that he dropped R.W. while in the shower with her; that she rejected any notion that Williams abused R.W.; and that she was ready to resume her relationship with him when he was released from prison. It was Dr. Deyoub's opinion that the children should not be returned to Apelu until the court was convinced that she had benefited from individual therapy, had gained insight, and was able to protect her children in the future.

The trial court adjudicated the juveniles dependent/neglected in an order entered December 14, 2010. Furthermore, because R.W.'s injuries were significant—fractures to her arm and clavicle, bruising and marks on her face, and lacerations in her mouth—the trial court found by clear and convincing evidence that R.W. had been subjected to aggravated circumstances. The trial court further found:

> Both parents have credibility issues. Initially, Mr. Williams tried to blame his mother for [R.W.'s] injuries. When his account was found to be a lie, he changed his story. Mr. Williams's accounts are inconsistent with how the injuries occurred. Ms. Apelu went along with the father's first account, knowing it was a lie. [R.W.] was just over two months old when she sustained these injuries. Either or both of the

---

1. At the time of the hearing on the petition to terminate the parental rights of Apelu as to R.W., F.I. had been placed in his biological father's custody. Furthermore, after this case began, Apelu became pregnant with and gave birth to a second child with Williams, a son, R.W.2. Neither of these children are the subject of this termination proceeding. Additionally, although Williams's parental rights to R.W. were also terminated at the same time as Apelu's, Williams has not appealed the termination of his parental rights and is not a party to this appeal.

parents should be able to explain what happened to her; however, neither is stepping up to the plate. Contrary to the parents' assertions, these injuries were not the result of an accident. Rather, they were the result of some person or persons physically abusing the child. The court cannot be sure that both parents were not responsible for [R.W.'s] injuries. It is troubling to the court that Ms. Apelu is putting Mr. Williams ahead of her children's safety by covering for him.

Before the court would be able to return the children to either parent, there will have to be a better explanation for [R.W.'s] injuries. Without a better explanation, the court will be hard pressed to return the children. The court will need a credible explanation at some point for these injuries. Failure to provide such credible explanation could be a barrier to reunification. For it is only when the cause of the injuries becomes known, can the court fashion a remedy to prevent their reoccurrence.[2]

This order was not appealed. In a February 2011 review order, the trial court found that while Apelu and Williams were making efforts to comply, reunification continued to be "a long shot." In a permanency-planning order filed on September 21, 2011, the trial court changed the goal of the case from reunification to adoption. In the permanency-planning order, the trial court reiterated its findings from the adjudication order, and further found:

The mother has made an effort to comply with the court orders, but the court is uncertain that the mother has made any progress. The mother has visited, completed the psychological evaluation, tested negative on random drug screens, attended therapy and parenting classes. The mother has not accepted that the injuries that [were] suffered by her children were intentional. If Mr. Williams was the offender and not the mother, then it is concerning that the mother only separated from the father less than one month ago. She testified today that she still loves Mr. Williams and has concealed from DHS and her therapist that she is seven months pregnant with his child. It concerns the court that the mother is still in love with Mr. Williams and it is only a matter of time before the two are back together and she allows him to move back into the home. The court will not monitor this case forever. Permanency must be achieved for these children.

The mother continues to have credibility issues, and the court is not certain if Mr. Williams was the offender. Both mother and father were responsible for these children and neither has given a plausible explanation for the injuries.

DHS filed a petition for termination of parental rights on November 4, 2011. In the petition, DHS alleged three grounds for termination of Apelu's parental rights: that the juvenile had been adjudicated dependent/neglected by the court and had continued out of the custody of the

---

2. The adjudication order also addressed injuries found on F.I.—healing rib fractures that were discovered after the children came into foster care. The fractures were ascertained to have occurred sometime after September 1, 2010; contrary to Mr. Williams's suggestion, the trial court found that the fractures probably occurred prior to F.I.'s entry into foster care. Additionally, the CASA volunteer testified that in reviewing F.I.'s medical records in conjunction with this case, he suffered a broken left leg in July 2009 and presented to the emergency room in August 2010 with an injury to his right leg. Both of these incidents were attributed to F.I.'s cousin, which was troubling to the CASA volunteer because it was a similar explanation for two separate incidents.

parent for twelve months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent (Ark.Code Ann. § 9–27–341(b)(3)(B)(i)(a));

subsequent to the filing of the original petition for dependency-neglect, other factors or issues arose which demonstrate that return of the juvenile to the family home is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances which prevent return of the juvenile to the family home (Ark.Code Ann. § 9–27–341(b)(3)(B)(vii)(a));

the parent is found by a court of competent jurisdiction, including the juvenile division of the circuit court, to have subjected any juvenile to aggravated circumstances. Aggravated circumstances means a juvenile has been abandoned, chronically abused, subjected to extreme or repeated cruelty, sexually abused, or a determination has been made by a judge that there is little likelihood that services to the family will result in successful reunification (Ark.Code Ann. § 9–27–341(b)(3)(B)(ix)(a)(3)).

After a hearing, the trial court granted DHS's termination petition, finding that all three grounds alleged in the petition were proven by clear and convincing evidence as to both Apelu and Williams. With regard to Apelu, the trial court found:

The child has been out of the home more than one year, and the mother has not remediated the conditions that caused removal. There are two major issues with the mother; lack of trust and poor judgment. The court is inclined to believe that Mr. Williams was the perpetrator in this case, but the court cannot be certain. If Mr. Williams was the abuser and not the mother, then by the time of the adjudication hearing, the mother should have had serious concerns about Mr. Williams. There was substantial testimony and the court made findings at the adjudication that [R.W.'s and F.I.'s] injuries were due to abuse and were not accidental in nature. If the mother was not the abuser, then she should have realized that it was Mr. Williams and ceased any relationship with him. If Mr. Williams was the abuser, then why would the mother continue in a relationship with him and have another child with Mr. Williams. This demonstrates a terrible lack of judgment on the mother's part. This court found that the mother had credibility issues at the adjudication hearing, and the mother continues to have credibility issues today. The mother concealed that she was pregnant until she was seven months into her pregnancy. She concealed [from] DHS that she was having housing issues until she was scheduled to be evicted.

. . . .

This case is about the mother's inability to make good judgment calls and protect her child. The mother testifies that she is no longer in a relationship with Mr. Williams, but she admitted that she continues to have phone contact with Mr. Williams and she went to the restaurant where he works only a few days before this hearing.

There would be potential harm to [R.W.] if she were returned to her mother or father. Mr. Williams could easily come back into the picture and cause harm to this child. [R.W.] was only two months old when she came into care with a substantial amount of injuries. In addition, [F.I.] had healing rib fractures. Today, the mother begrudgingly admit-

ted that Mr. Williams has not been completely honest, but that is not good enough. Neither parent has ever given a credible explanation for the injuries. The court does not believe that the mother could adequately care for this child and protect her from additional injuries. There are no compelling reasons to give these parents additional time. The mother made an effort to comply, but she has not remediated the conditions that caused removal. The court questions whether this mother has truly disavowed her relationship with Mr. Williams. As to the mother, the Department has proven all three grounds alleged in the petition by clear and convincing evidence.

The court finds by clear and convincing evidence that it is in the best interest of the juvenile, [R.W.], to terminate parental rights and the court specifically considered the likelihood that the juvenile will be adopted if the termination petition is granted; the potential harm on the health and safety of the juvenile caused by returning the juvenile to the custody of the parents.

Apelu timely filed her notice of appeal from the termination order.

## Discussion

This court set forth our standard of review in termination cases in *Torres v. Arkansas Dep't of Human Servs.*, 2012 Ark.App. 423, at 4–5, 2012 WL 2406614:

We review termination of parental rights cases de novo. *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001). Termination of parental rights is an extreme remedy and in derogation of the natural rights of parents, but parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Id.* Grounds for termination of parental rights must be proved by clear and convincing evidence. *Camarillo–Cox v. Ark. Dep't of Human Servs.*, 360 Ark. 340, 201 S.W.3d 391 (2005); *M.T. v. Ark. Dep't of Human Servs.*, 58 Ark.App. 302, 952 S.W.2d 177 (1997). It must also be proved that termination of parental rights is in the children's best interest. *Smith v. Ark. Dep't of Health & Human Servs.*, 100 Ark.App. 74, 264 S.W.3d 559 (2007). Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Anderson v. Douglas*, 310 Ark. 633, 839 S.W.2d 196 (1992). When the burden of proving a disputed fact is by clear and convincing evidence, the appellate inquiry is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *J.T. v. Ark. Dep't of Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997). We give due regard to the opportunity of the trial court to judge the credibility of the witnesses. *Id.* Where there are inconsistencies in the testimony presented at a termination hearing, the resolution of those inconsistencies is best left to the trial judge, who heard and observed the witnesses first-hand. *Dinkins, supra.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.*

Apelu's primary focus on appeal is the trial court's determination that R.W. would be subject to potential harm if returned to her custody, and therefore, termination was in R.W.'s best interest. Apelu argues that, while it took some time for her to disavow her relationship with Williams, she had done so, and that while she had diligently worked her case plan, the trial court was unable to separate her from Williams in its estimation because she did not immediately separate from

Williams and instead stood by him and became pregnant by him after this case was opened. In support of her argument that she has disavowed any relationship with Williams, she points to her therapist's testimony at the termination hearing that she had come "full circle" in breaking the cycle of abuse/control/manipulation that Williams had over her, which was made more difficult because of her American Samoan background and tendency to be passive in her relationships with men.

Ultimately, this case boils down to credibility, the determination of which lies with the trial court. The trial court was not obligated to believe Apelu's testimony or that of her therapist. Furthermore, the trial court was up-front about credibility concerns from the outset and the fact that it needed to know how R.W. came to be injured, beginning in its adjudication order. In the review order, filed in February 2011, Apelu was still living with Williams. In the permanency-planning order, filed in September 2011 (approximately three months before the termination hearing), the trial court found that Apelu had separated from Williams less than a month before but was still professing that she loved him and was pregnant with a second child with him.

There is certainly evidence to support the trial court's determination that it did not find Apelu to be credible. As the trial court pointed out, either both parents were the cause of R.W.'s injuries, or, if Williams was the perpetrator, Apelu stood by Williams for a significant amount of time and refused to believe that he could have hurt her children, to the detriment of regaining custody of her children. The termination hearing was the first time that Apelu told the trial court that she was not going to resume her relationship with Williams; however, while she testified that she did not physically injure her child or knowingly allow physical injuries to her

child, and she thought that Williams caused the injuries, Apelu still testified that she could not say that Williams abused two of her children, that she did not know if he had, even in light of medical testimony that the injuries were a result of abuse. Not only was R.W. abused, but after F.I. was removed from Apelu's custody, it was determined that he also had healing rib fractures. So at the time the trial court was making a determination as to whether Apelu's parental rights to R.W. would be terminated, she still had no answer as to what happened to R.W. or F.I. This certainly does not lend credibility to Apelu's assertion that she could protect her children from further harm at the hands of another male, be it Williams or someone else. The trial court stated in the termination order that it was inclined to believe that Williams was the perpetrator of the injuries, but that it could not be certain. Furthermore, the trial court was disturbed by the fact that after this case was opened, Apelu hid the fact that she was pregnant by Williams for seven months from DHS and from her therapist, and hid her eviction from her apartment from DHS as well, leading the trial court to question what else Apelu was hiding, i.e., a possible relationship with Williams. These are legitimate concerns, especially in light of the deliberate injuries that were inflicted on two children at very tender ages, and we cannot say that the trial court's credibility determinations and the decision that termination was in R.W.'s best interest were clearly erroneous.

Apelu also makes a passing argument that because in her view there was insufficient evidence that it was in R.W.'s best interest to terminate her parental rights, there was therefore no basis for any of the grounds that the trial court used to terminate her parental rights. Only one ground is required to terminate parental rights. Apelu's argument that she did not fail to

remedy the issues that caused removal is based on the same premises argued above with respect to the evidence supporting a finding that it was in R.W.'s best interest for Apelu's parental rights to be terminated. As this argument fails above, it must also fail in this regard as well.

Affirmed.

WYNNE and BROWN, JJ., agree.