

# ARKANSAS COURT OF APPEALS

DIVISION IV
**No.** CV–16–869

|  |  |  |
|---|---|---|
| | | **Opinion Delivered** MAY 24, 2017 |
| HAROLD FOSTER | | |
| | APPELLANT | APPEAL FROM THE LOGAN COUNTY CIRCUIT COURT, NORTHERN DISTRICT |
| V. | | [NO. 42PPR-12-48] |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES, DIVISION OF AGING AND ADULT SERVICES | | HONORABLE DAVID H. MCCORMICK, JUDGE |
| | APPELLEE | AFFIRMED |

## N. MARK KLAPPENBACH, Judge

This is an appeal from the order entered on June 22, 2016, by the Logan County Circuit Court denying appellant Harold Foster's petition to terminate a guardianship over his person and estate. Foster asserts that he was able to care for himself and that the trial court clearly erred in denying his request to end the guardianship. We affirm.

Foster entered a residential-care facility at Short Mountain Lodge in Paris, Arkansas (hereinafter "the facility" or "the lodge"), in August 2011, following his separation from his wife and during the process of divorcing. Foster was diagnosed with bipolar disorder and depression with a history of poly-substance abuse, and he required medication supervision. In February 2012, an administrator at the facility sought to have a guardian appointed for him.

At the hearing conducted in April 2012 on this request, Johnna Kelley (the facility's owner and administrator) testified that Foster had been referred to the facility in August 2011 by a Northwest Arkansas medical center's behavioral-health unit. Foster moved to the facility,

SLIP OPINION

where he lived with a roommate, underwent therapy, and was administered medications. His medications included lithium carbonate to stabilize his mood, sertraline to treat his depression, and Seroquel to inhibit psychotic behavior. Kelley did not think that Foster was able to take care of himself successfully on his own at that time.[1] Following this hearing, Foster was found to be incompetent by virtue of a mental deficiency. The order reflecting this finding was filed in April 2012, and a public guardian[2] was appointed.

In June 2012, Foster's guardian requested permission from the court to hire Foster an attorney to represent him in the divorce action. This request was approved in July 2012. In August 2012, Foster's guardian requested and was given court approval to enter into a property-settlement agreement, which had been accepted by all parties to the divorce proceedings, on behalf of Foster. The six-page property-settlement agreement was attached to the order authorizing settlement.

Foster remained at the residential facility. In October 2014, at the request of his guardian, the trial court authorized Foster's guardian to place Foster in a secure placement for mental-health treatment without first petitioning the court at any time Foster met that criteria due to his history of having periods of psychosis and multiple acute placements in the past. The alleged facts that prompted this request were that Foster had recurring hostility toward

---

[1] The transcript of this hearing demonstrates that Foster was present and did not object to the guardianship.

[2] Foster was provided a guardian through the Department of Human Services's Division of Aging & Adult Services, specifically via the Office of the Public Guardian for Adults.

SLIP OPINION

his ex-wife, who had a ten-year order of protection against him; he at times made threats of extreme violence toward her and others; he had recently refused to take his medications, attend treatment, or abide by directions; and he had expressed intent to return to the county where his ex-wife resided. This behavior indicated that Foster posed a risk to both himself and others.

In January 2015, Foster filed a pro se motion to terminate the guardianship.[3] Foster was age 59. Also in January 2015, his guardian filed a petition for emergency injunctive relief, listing Foster's refusal to cooperate with treatment or with his guardian; his persistent attempts to contact his ex-wife via threatening letters and phone calls; his presentation of a fabricated letter purportedly from his sister in which she vouched that he was competent; his fabrication of doctor's appointments to cover his reasons for leaving the lodge; his constant threats to leave the lodge; and his fits of hostility and rage toward lodge staff. Foster's guardian requested that Foster be prohibited from mailing anything without permission from his guardian or lodge staff and that Foster be required to participate in his treatment. Foster, who was then represented by a separate attorney, resisted the guardian's request for emergency injunctive relief.

---

[3]Foster attached multiple handwritten documents in which he asserted that he had never been deemed incapacitated; that the guardianship was void due to lack of notice; that the guardian had been "dishonest, inept, irresponsible, and unprofessional"; and that a guardianship was not and had never been in his best interest. Foster also attached two letters authored in 2013 (one from an attending psychiatrist and one from a social worker with the public guardian's office) that discussed Foster's request to transition out of the lodge into independent living and the steps recommended that he take to achieve that goal.

SLIP OPINION

In March 2015, Foster's attorney filed another petition to terminate the guardianship, alleging that Foster did not have a mental deficiency, that he had sufficient capacity to handle his own affairs, and that a guardianship was no longer in his best interest. Foster's guardian opposed his petition.

A hearing was conducted in June 2016 to consider Foster's petition. Foster's guardian abandoned the attempt to obtain emergency injunctive relief. Dr. Paul Deyoub, a forensic psychologist, testified that he had performed a psychological evaluation on Foster in February 2016. Deyoub conducted intelligence testing, personality testing, and an interview, and he reviewed documents related to Foster's care. Foster was determined to have an average IQ, and the personality-testing results were within normal limits. Foster's poly-substance abuse disorder was in remission, which Deyoub attributed to his being in a residential facility. Deyoub opined that Foster continued to be incapacitated for purposes of guardianship law.

Deyoub recounted that Foster was not participating in therapy, although he was taking his medication. Deyoub opined that Foster continued to need supervision given his obsession with his ex-wife; his stated belief that the divorce matters were not final; his bitterness toward her; his anger about the property issues related to their divorce; and his "half-baked" idea to move with his 29-year-old mentally ill girlfriend to a city near his ex-wife. Deyoub said that Foster's condition was essentially the same as when he had been declared incompetent in 2012 and that he had no rational, reasonable plan for independent living. Deyoub noted that Foster told him that he would pursue outpatient mental-health treatment if released but that this

4

SLIP OPINION

made no sense since he refused treatment at the lodge where he lived.

Deyoub stated that it was possible for Foster to work with his guardian toward a less restrictive and more independent living environment in a step-down approach if that was what he really wanted. Deyoub testified that he was "trying to caution the court before something disastrous happens." The doctor opined that the combination of his bipolar disorder, obsessions, and bitterness created a lack of safety. He thought that the guardianship was effective and working because Foster was presently "restrained from more egregious behavior." Deyoub expressed concern about Foster being "very unpredictable if he doesn't have the supervision that he now has."

Ronald Bush, a therapist at Western Arkansas Counseling and Guidance Center, conducted a psychological assessment in November 2015 at Foster's request. Bush thought that Foster seemed well maintained on his medications. Bush recounted that Foster had expressed frustration at not being able to represent himself appropriately in the property-settlement matters; Foster questioned whether the property-settlement matters were valid. Bush was unaware, however, of the letters Foster had written or the fact that Foster was represented by counsel in his divorce proceedings. The therapist said that Foster expressed feeling "stymied in being able to pursue what he wants to pursue" because of the continued guardianship. Bush related Foster's plan to move to Northwest Arkansas with his girlfriend and to seek treatment there, which Bush thought was a reasonable plan. Bush acknowledged, however, that his opinion was based on very limited data and should not replace more

comprehensive information available from those persons with more extensive experience and history with Foster.

The next witness was Regina Wilhite, the administrator at the lodge, who testified that she had daily interaction with Foster since 2011. She believed that Foster had made progress. Wilhite said that she had witnessed Foster acting irrationally or bizarrely but that this had been over a year ago.

Foster testified that he had just turned 60 years old, that he currently lived with his 29-year-old girlfriend Sarah at the lodge, and that he functioned without problems his whole life until the summer of 2011 when he decided to leave his unfaithful wife. Foster entered a mental-health facility in Springdale on his own, staying for two weeks, because he was "an emotional basket case." When he left there, he was unable to return home, so he decided to go to Short Mountain Lodge in Paris for a few months of "respite." Foster had been there ever since. He said that the administrator of the lodge had taken him to court to get a guardian in 2012 without anything to prove his incapacity; he said he had been told it would be helpful to have a guardianship with regard to settling his legal issues with his then wife. Foster was unhappy because his divorce[4] was "botched" by the attorney hired for him by his guardian, his ex-wife's order of protection was not dealt with, and he had still not recovered his property. He said that his letters to his ex-wife were in an effort to settle the real- and

---

[4]Foster acknowledged that the divorce decree was entered in September 2012, which was a few months after the guardianship had been ordered.

SLIP OPINION

personal-property issues that remained outstanding. Foster planned to go through the proper legal channels to recover his property without going to see his ex-wife. He said he had undergone extensive therapy and had been taking proper medications for between two and three years, so he felt that he was being wrongfully monitored by his guardian. Foster wanted to leave the lodge, move to Fayetteville with Sarah, recover his truck and carpentry tools, and just live a peaceful life. Foster maintained that he was no longer incapacitated; he maintained that he could take care of himself and that the guardianship was not helpful or necessary.

Foster's girlfriend, Sarah Bellas, testified that she is bipolar and has ADD but that she is not under a guardianship. She said she and Foster had been roommates at the lodge for about a year and a half; she was waiting to leave the lodge with Foster to move to Northwest Arkansas.

The trial court took the matter under advisement for about two weeks, followed by the trial court entering an order on June 22, 2016, denying Foster's petition. The trial court found that Foster was still an incapacitated person and that Foster had not presented sufficient evidence to demonstrate that the guardianship should be terminated. This appeal followed.

Before turning to the argument raised on appeal, we set forth the applicable law to this matter. In the general definitions used in the context of guardianships, Arkansas Code Annotated section 28-65-101(5)(A) (Repl. 2012) defines an "incapacitated person" to mean "a person who is impaired by reason of a disability such as mental illness, mental deficiency, physical illness, chronic use of drugs, or chronic intoxication, to the extent of lacking

SLIP OPINION

sufficient understanding or capacity to make or communicate decisions to meet the essential requirements for his or her health or safety or to manage his or her estate." Arkansas Code Annotated section 28-65-402(a) (Repl. 2012) requires that if any person alleges in writing, verified by oath, that a person declared to be incapacitated is no longer incapacitated, the court in which the proceedings were held shall conduct a factual inquiry. Arkansas Code Annotated section 28-65-401(a)(1) (Supp. 2015) provides that a guardianship is terminated, if the guardianship was solely because of the ward's incompetency for a cause other than minority, by an adjudication of the competency of the ward. A guardianship may also be terminated if the trial court finds that the guardianship is no longer necessary or in the best interest of the ward. Ark. Code Ann. § 28-65-401(b)(3).

The rule is settled that once a person's incompetency is established, that incompetency is presumed to continue until a change has been established by proof. *Lester v. Pilkinton*, 225 Ark. 349, 282 S.W.2d 590 (1955). In reviewing the probate court's finding on whether a change has been established, we affirm unless the court's decision is clearly erroneous, giving due regard to the opportunity of the trial court to judge the credibility of the witnesses. *Matter of Estate of Lemley*, 9 Ark. App. 140, 143, 653 S.W.2d 141, 143 (1983).

Foster argues that the trial court clearly erred in denying his petition to terminate the guardianship because his "ability to care for himself was clearly established by the proof." Foster contends that he presented compelling testimony from the therapist, the lodge administrator, and himself to demonstrate that he was no longer incapacitated. Foster argues

8

that Dr. Deyoub's expert opinion was faulty because he relied on factual errors: that Foster had the delusional belief that he was not divorced, that Foster was unwilling to properly care for his own mental-health needs, and that Foster presented a danger to his ex-wife. Foster asserts that those suppositions were not borne out by the evidence and that the matters between Foster and his ex-wife had no bearing on whether he needed a guardian.

We are not persuaded that the trial court clearly erred. The trial judge was tasked with weighing the evidence, resolving any conflicts in the evidence, and determining what was most credible. Foster did not provide the trial court with persuasive compelling evidence that he was no longer incapacitated or that a guardianship was no longer necessary to protect his best interests. The trial court was obviously persuaded by Dr. Deyoub's professional opinion that Foster could work with his caregivers to move toward independence but was not yet ready to be without the protections afforded him by the guardianship. Foster's argument essentially asks our court to be a super-fact-finder, which we are not permitted to do. *Harris v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 508, 470 S.W.3d 316; *Johnson v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 244, 413 S.W.3d 549. In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the circuit court to assess the witnesses' credibility. *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001); *Sutton v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 459, 503 S.W.3d 842; *Matter of Estate of Lemley*, *supra*. Foster bore the burden to establish his competency or that a guardianship was no longer necessary, and we cannot say that the trial court clearly

erred in finding that he did not carry that burden at the time the petition was heard.

Affirmed.

GRUBER, C.J., and HIXSON, J., agree.

*Laura Avery*, for appellant.

*Richard W. Atkinson*, Arkansas Department of Human Services, for appellee.