2012 Ark. App. 29

Savannah ROSSIE–FONNER,
Appellant

v.

ARKANSAS DEPARTMENT OF
HUMAN SERVICES and C.R.,
a Minor, Appellees.

No. CA 11–888.

Court of Appeals of Arkansas.

Jan. 4, 2012.

Leah Beth Lanford, Little Rock, AR, for appellant.

Tabitha Baertels McNulty, Little Rock, AR, Keith L. Chrestman, Jonesboro, AR, for appellee.

WAYMOND M. BROWN, Judge.

Savannah Rossie–Fonner appeals from the June 15, 2011 order terminating her parental rights to her son, C.R. (born December 7, 2009). We affirm.

*Factual Background*

On April 1, 2010, the Arkansas Department of Human Services (DHS) received a report that appellant, while bathing her four-month-old son C.R., heard a voice telling her to drown him. This incident occurred on or about March 16, 2010. The call on April 1, 2010, was made by appellant's physician, Dr. Trehun, after appellant reported the incident during an appointment. It was also reported that appellant had a history of mental illness,

had been diagnosed with a mood disorder, had missed three mental health appointments since December 2009, and was not taking any medication. DHS took C.R. into custody.

DHS petitioned for emergency custody and a finding of dependency/neglect, and on April 23, 2010, the Pulaski County Circuit Court entered an order finding that there was probable cause for C.R. to remain in DHS custody. The court instructed DHS to develop an appropriate case plan and ordered that appellant and her live-in boyfriend, Chris Fonner, undergo psychological evaluation. The court ordered appellant and her parents (biological mother Jeanne Rossie and adoptive father Paul Rossie) to have supervised visitation at DHS and authorized DHS to proceed with home evaluations on relatives interested in placement. C.R. was placed in foster care with Mr. and Mrs. Rossie.

On May 17 and 18, 2010, Dr. Paul Deyoub performed psychological evaluations on appellant, her parents, her sister, and Chris Fonner. Dr. Deyoub noted that appellant reported a history of seizures and mental illness and had been diagnosed with bipolar disorder; had received mental health treatment since the age of five; had been hearing voices all of her life; and had, on several occasions since the sixth grade, stood over family members with a knife while they slept. Appellant also told Dr. Deyoub that she had used drugs as a teenager;[1] used marijuana and methamphetamine in March 2010 and used "some marijuana" during her pregnancy with C.R.; and was on probation for felony second-degree battery for hitting her mother with a baseball bat on the elbow while she was "blacked out" in June 2008. The injuries to her mother's arm from this incident required surgery. Jeanne Rossie told Dr. Deyoub that during the incident,

appellant also attacked her aunt (Rossie's sister), who was suffering from cancer at the time.

Dr. Deyoub noted in his psychological evaluation report that Chris Fonner was twenty-four years old and was the assistant manager at a Subway sandwich store. Fonner told Dr. Deyoub that he had been with appellant for about a year and that they were living with his mother when the incident causing C.R. to be taken into custody by DHS occurred. Fonner said that when appellant heard the voice telling her to drown C.R., she immediately called her mother for help, and her sister came and got C.R. Mrs. Rossie corroborated this account and told Dr. Deyoub that she and her husband, Paul Rossie, would like to have custody of C.R., that they were taking foster-care classes, and that they hoped that appellant would voluntarily agree to their having permanent guardianship. Paul Rossie told Dr. Deyoub that he adopted appellant when she was two years old.

Dr. Deyoub ruled out postpartum depression and diagnosed appellant with schizoaffective disorder, bipolar type, cocaine abuse (stated to be in remission), methamphetamine and cannabis abuse; borderline personality disorder; and seizure disorder. He stated in his report that one of appellant's problems was intense hostility; she was "bizarre and disturbed" and "very unpredictable"; she scored very high for the Paranoid scale and also had elevated Antisocial and Psychopathic Deviancy scales; she also had a character disorder and "significant mental illness"; and she had little insight about her parenting issues. He noted in his report that at one point during her Rorschach test, appellant said that she had "a dragon that follows her for protection."

---

1. Appellant was twenty-three years old at the time of the evaluation.

Dr. Deyoub described her condition and its effect on her parenting ability as follows:

Due to her mental illness and character disorder, she is a danger and a risk to her son [C.R.] This is a tragedy waiting to happen if she has unsupervised contact with [C.R.]

What makes her such a high risk patient is the combination of her schizoaffective disorder and her borderline personality disorder. The schizoaffective disorder provides for Bizarre Mentation and hallucinations while the personality disorder ensures that she has the propensity to act out. We already know this is true, because she cracked her mother's elbow with a baseball bat. She admitted standing over family members with a knife so we know this is not just obsessional thinking, but actual homicidal and violent behavior. She is permanently unfit to raise [C.R.] or any other child. There would be no way of ensuring that she is stable, and there is no cure.... She could be on her medication and stable for awhile, but there is no such thing as someone with her diagnoses who will not relapse or go off their medication or have a psychotic episode. Episodes of deterioration will occur with 100 percent certainty and it will be during one of these episodes that [C.R.] will be at risk. She thinks all she needs to do is tweak her medication and [C.R.] should be returned to her. This is not the case, because her circumstances are going to change.... · [C.R.] should be in the permanent custody of the grandparents, and Savannah should only have supervised visitation indefinitely.

On June 18, 2010, the court entered an order adjudicating C.R. dependent-neglected, quoting extensively from Dr. Deyoub's evaluation report and finding that, although no harm had befallen C.R. as a result of the bathtub incident, appellant "poses a real and substantial risk of serious injury or death to the juvenile due to her mental health issues." The court set the goal of the case as reunification, ordering appellant to follow the recommendations of her psychological evaluation, but stated that the prospects of reunification were not very encouraging and that the most viable option might be permanent relative placement. The court ordered appellant to have supervised visitation.

A review hearing was held on August 31, 2010. The court found that it was contrary to C.R.'s best interest to return him to appellant and that continued custody with DHS was necessary to protect his health and safety. The court kept the goal as reunification and noted that appellant "appears to be making an effort to comply with court orders" but that "it remains to be seen whether progress is being made." The court ordered DHS to arrange a medication assessment for appellant, and a permanency-planning hearing was scheduled for January 25, 2011.

At the permanency-planning hearing, the court changed the goal of the case to concurrent goals of termination of parental rights and reunification, and ordered DHS to arrange for appellant to undergo a second psychological evaluation. The court explained the reasoning behind its ruling:

Let the court be clear. The mother has complied with court orders, but have the conditions which caused removal been remediated? This is the question the court must answer. According to Dr. Deyoub, the conditions will never be remedied. Somewhat consistent with that view is the mother's comportment at today's hearing. Even today, when the mother was testifying and wanting to make a favorable impression with the court, although some emotion is to be expected, the court could feel her anger coming out. The court believes that the

mother continues to have great anger which could be a risk to the child. The concern is not just the mother's mental illness by itself, but that her mental illness affects her ability to parent and ability to protect her child.

The court noted that appellant had proposed a safety plan consisting of certain individuals who would be available to care for C.R. if she felt herself to be on the verge of psychosis. But, the court reflected, "these safety plans may not go as planned when psychosis suddenly strikes, and we are talking about a completely defenseless young child.... Having a child in the home can be a stressor, and the mother has not had to deal with such stress." The court noted that appellant's treating therapist "appeared to be in [appellant's] corner," but that "the court still has to weigh the therapist's recommendations in light of what is in the child's best interests." What the court termed a "permanency termination of parental rights and/or permanent custody hearing and/or permanency planning hearing" was scheduled for April 19, 2011.

Dr. George DeRoeck performed a second psychological evaluation of the appellant on March 16, 2011. During the evaluation, appellant told Dr. DeRoeck that she had engaged in self-abuse since the age of five and had been hospitalized at age fourteen for attempted suicide. She also told him that when she got her son back, she wanted to move to Delaware, where her biological father lived.[2] Dr. DeRoeck diagnosed her with bipolar disorder; cocaine, amphetamine, and cannabis/alcohol abuse (in controlled environmental remission); and personality disorder with nar-

cissistic, paranoid, and borderline traits. Dr. DeRoeck stated in his evaluation report that appellant showed indications of instability and shallowness in interaction with others, difficulty coping with unwanted moods and limited insight into that tendency, and a tendency toward a lack of empathy. He stated that appellant was "likely to demonstrate unrealistic expectations in relationships with others that may often find her isolated or alienated from others." Dr. DeRoeck overall had a more favorable view of her prognosis than Dr. Deyoub:

> Currently and with continued treatment/medication along with sustained recovery from cannabis/alcohol abuse, Ms. Fonner[3] presented as relatively stable. Notwithstanding the seriousness of hearing a voice telling her to drown her child in the bath, she evinced the presence of mind to report the incident to others, attempt to obtain viable treatment for her condition and obtain childcare help until "stable." Although a number of psychopathological indicators are present in her presentation, it is my opinion that Ms. Fonner's efforts over the past 9–10 months suggest the residual capacity to manage in the supportive care of her son while stabilized on medications and with a support network in place.

However, Dr. DeRoeck recommended that appellant receive close monitoring by DHS regarding compliance with medication and counseling services, as well as stress management, counseling, family integrative counseling, and parenting-skills instruc-

---

2. Appellant later testified at the termination-of-parental-rights hearing that she never had any contact with her biological father until she was seventeen years old, but now spoke to him on the telephone and wanted him to have custody of C.R. if she could not.

3. At some time during the pendency of the case, prior to the January 25, 2011 hearing, appellant and Chris Fonner were married.

tion, and continued supervised visitation before being allowed weekend visitation.

On March 18, 2011, DHS filed a petition for termination of parental rights (TPR), and a hearing was held on April 19, 2011. After reviewing all evidence and testimony presented, the court found that DHS had proved by clear and convincing evidence that C.R. was adjudicated dependent-neglected, had continued to be out of appellant's custody for twelve months, and despite a meaningful effort by DHS to rehabilitate appellant and correct the conditions that caused removal, those conditions had not been remedied by appellant.

## Standard of Review

■ Termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents.[4] A heavy burden is placed upon a party seeking to terminate the parental relationship, and the facts warranting termination must be proved by clear and convincing evidence.[5] Clear and convincing evidence is that degree of proof which will produce in the fact-finder a firm conviction regarding the allegation sought to be established.[6] This standard of proof reduces the possibility that a parent's rights are terminated based solely on a few isolated instances of unusual conduct or idiosyncratic behavior, and impresses the fact-finder with the importance of the decision, thereby perhaps reducing the chances that inappropriate terminations will be ordered.[7] However, courts are not to enforce parental rights to the detriment or destruction of the health and well-being of the child.[8]

■ Cases involving the termination of parental rights are reviewed de novo on appeal.[9] The appellate court will not reverse the trial court's decision unless the court's finding of clear and convincing evidence is clearly erroneous.[10] A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed.[11] We give a great deal of deference to the trial court, as the trial court is in a far superior position to observe the parties before it and judge the credibility of the witnesses.[12] On de novo review, this court will only reverse on grounds properly argued by the appellant.[13]

## Discussion

Our termination statute requires clear and convincing proof that termination is in the child's best interest, plus clear and convincing proof of at least one enumerated ground for termination.[14] A best-interest finding must be based upon a consideration of at least two factors: the likelihood that the juvenile will be adopted if TPR is

4. *Smith v. Ark. Dep't of Human Servs.*, 100 Ark.App. 74, 264 S.W.3d 559 (2007).

5. *Albright v. Ark. Dep't of Human Servs.*, 97 Ark.App. 277, 248 S.W.3d 498 (2007).

6. *Smith, supra.*

7. *See Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

8. *Smith, supra.*

9. *Dinkins v. Ark. Dep't of Human Servs.,* 344 Ark. 207, 40 S.W.3d 286 (2001).

10. *Id.*

11. *Gregg v. Ark. Dep't of Human Servs.,* 58 Ark.App. 337, 952 S.W.2d 183 (1997).

12. *Dinkins v. Ark. Dep't of Human Servs.,* 344 Ark. 207, 40 S.W.3d 286 (2001).

13. *See, e.g., Country Gentleman, Inc. v. Harkey,* 263 Ark. 580, 569 S.W.2d 649 (1978).

14. *Smith, supra;* Ark.Code Ann. § 9–27–341(b)(3) (Repl.2009).

granted, and the potential harm caused by continued contact with the parent.[15] There is no requirement that every factor considered be established by clear and convincing evidence; rather, after consideration of all factors, the evidence must be clear and convincing that the termination is in the best interest of the child.[16] The statute only requires the trial court to consider the potential harm to the health and safety of a child that might result from continued contact with the parents.[17] Furthermore, our supreme court has directed that the potential-harm analysis be conducted in a forward-looking manner and considered in broad terms,[18] including the harm the child suffers from the lack of stability in a permanent home.[19] The court is not required to find that actual harm would result or to affirmatively identify a potential harm.[20]

The statutory ground cited by DHS in its petition for TPR was Ark.Code Ann. § 9–27–341(b)(3)(B)(i)(a), which provides for termination when the juvenile has been adjudicated by the court to be dependent-neglected and has continued out of the custody of the parent for twelve months and, despite meaningful effort by the department to rehabilitate the parents and correct the conditions that caused removal, those conditions have not been remedied by the parents.

In this case, there was sufficient evidence to support the circuit court's ruling, and we cannot say that the court's termination of appellant's parental rights was clearly erroneous. The DHS caseworker, Bridget Williams, testified that C.R. was adoptable and that, despite the services provided to the appellant,[21] TPR was in the child's best interests because, although appellant might be able to present as a competent parent at times, her condition was such that there was no way to ever know that C.R. would be safe. Williams testified that the idea of having a third party live in appellant's home and supervise her and the child was not a realistic possibility in terms of ensuring C.R.'s safety because of appellant's interpersonal problems and instability in relationships, and Williams expressed concern that C.R. was too young to report any problems that might occur. Williams further testified that appellant's plan to move to Delaware to live with her putative father, who had no relationship with C.R. and had only known appellant a short time, was clearly not in C.R.'s best interests. Appellant argues that she complied with the case plan and the court's orders. However, even full completion of a case plan is not determinative of the outcome of a TPR petition.[22] What matters is whether the intended result—making the parent capable of caring for the child—has been achieved.[23]

15. Ark.Code Ann. § 9–27–341(b)(3)(A) (Repl. 2009).

16. *McFarland v. Ark. Dep't of Human Servs.,* 91 Ark.App. 323, 210 S.W.3d 143 (2005).

17. *Dowdy v. Ark. Dep't of Human Servs.,* 2009 Ark. App. 180, 314 S.W.3d 722 (citing *McFarland v. Ark. Dep't of Human Servs.,* 91 Ark. App. 323, 210 S.W.3d 143 (2005)).

18. *Id.* (citing *Bearden v. Ark. Dep't of Human Servs.,* 344 Ark. 317, 42 S.W.3d 397 (2001)).

19. *Lee v. Ark. Dep't of Human Servs.,* 102 Ark.App. 337, 285 S.W.3d 277 (2008).

20. *Dowdy, supra.*

21. Williams stated that DHS had provided the appellant parenting classes, psychological evaluations, random drug screens, and supervised visitation with C.R.

22. *Lee v. Ark. Dep't of Human Servs.,* 102 Ark.App. 337, 285 S.W.3d 277 (2008).

23. *Id.*

Dr. Deyoub testified at the termination hearing that his psychological evaluation of appellant took an entire workday and consisted of both paper-and-pencil tests and about two and a half hours of face-to-face interaction. He stated that although he had not seen appellant since he evaluated her on May 17, 2010, he was not aware of any progress she might have made but that such progress would not change his recommendation because her mental illnesses were of a type that were chronic and would never change. He said that in his opinion, C.R. would always be at risk with appellant, and that if she had C.R. she would require supervision and "you hope nothing happens." In short, Dr. Deyoub did not believe that it was possible for appellant to safely parent C.R.

Two therapists who had treated appellant testified that they did not think appellant would harm C.R., but the circuit court explained that it did not grant those opinions as much weight because appellant had not had to care for a child for the past year, stating, "To me, that really undercuts the weight to be given their testimony...." The court noted that with regard to the psychologists who evaluated appellant and testified at the TPR hearing, Dr. Deyoub was "more pessimistic" about appellant's prospects of reunification than Dr. DeRoeck, but that Dr. DeRoeck "wasn't just saying we should hand the child back over." Rather, as the court noted, Dr. DeRoeck advocated a detailed safety plan to protect C.R. The court then reiterated that the interest of the child was the paramount concern in every case, and found that in light of that priority, a safety plan would not work in this case for several reasons. First, the court noted that all of appellant's witnesses testified that she was a good parent and did not pose a problem, making it unlikely that any of them would monitor her or enforce the safety plan as vigilantly as was necessary to keep C.R. safe. Second, C.R. was not even two years old yet and would be unable to protect himself or get help if he were in danger.

The circuit court further found that appellant lacked credibility because she testified, contrary to her earlier statements, that the voice she heard instructing her to drown C.R. might have been coming from the radio and not her own mind. The court stated that this sudden change of story demonstrated that appellant was not credible and lacked insight into her mental illnesses. The court was well within its discretion to make these assessments of the witnesses and the weight that should be attributed to their testimony. Our courts have repeatedly stated that there are no cases in which the superior position, ability, and opportunity to view the parties carry as great a weight as those involving minor children, "as a heavier burden is placed on the trial judge to utilize to the fullest extent his or her powers of perception in evaluating the witnesses, their testimony, and the best interest of the children." [24]

The court found that in light of appellant's history of actual violence and threatening behavior, as well as anger and hostility the court saw appellant display during her testimony, there was a clear and continuing risk of harm to C.R. The court considered granting permanent custody to appellant's parents, but found that the alternative would create instability in C.R.'s placement because, based on the hostility and anger the court saw appellant demonstrate and which Dr. Deyoub documented in his psychological evaluation, appellant

---

24. *Id.* (citing *Norwood v. Robinson*, 315 Ark. 255, 866 S.W.2d 398 (1993), and quoting *Hamilton v. Barrett*, 337 Ark. 460, 989 S.W.2d 520 (1999)).

would likely continue to clash with her mother and mount custody challenges.

The court further found that, in light of the legal requirement to look at permanency planning from the child's perspective,[25] there was no compelling reason to allow more time to achieve reunification because it would take "multiple more months of stability on the mother's part before the court could consider return of the child" and "[e]ven if the child were to be returned at some point, it would be necessary for the court to retain jurisdiction for perhaps years to ensure nothing happened to the child."

We cannot say that the circuit court's decision to terminate appellant's parental rights was clearly erroneous under the specific facts and circumstances of this case. The court's TPR order and discussion of its ruling at the TPR hearing demonstrate that the court's focus was appropriately on C.R.'s best interests, and that the court weighed the evidence and testimony presented and considered the factors bearing on its decision. The court assigned greater weight and credibility to some witnesses, such as Dr. Deyoub, and made its own observations about the conduct and personality of appellant, but these things are well within the discretion of the court. We note that the risk posed to the child in this case, should appellant's mental illnesses manifest, was not merely a risk of injury, but of death. The hallucination that gave rise to this case was not an isolated or anomalous event; rather, the evidence was that it was part of appellant's lifelong history of serious mental illness and dangerous or violent behavior,

and there was evidence to support a finding that the nature of this illness was permanent and unpredictable and would therefore continue to present a serious risk to C.R.[26] The record does not support appellant's argument that the circuit court terminated her parental rights simply because she had a mental illness. Rather, it demonstrates that the court was concerned with the permanent and unpredictable nature of appellant's mental illnesses, the alienating and destabilizing effect they had on her interpersonal relationships, and the severity of the risk those illnesses created for C.R. Upon a review of the entire evidence, we are not left with a definite and firm conviction that a mistake has been committed. We find no clear error and affirm.

Affirmed.

VAUGHT, C.J., and GLADWIN, J., agree.

---

**25.** Ark.Code Ann. § 9–27–341(a)(3).

**26.** This case is thus distinguishable from the case relied upon by the appellant, *Benedict v. Ark. Dep't of Human Servs.*, 96 Ark.App. 395, 242 S.W.3d 305 (2006). The appellant in *Benedict* suffered from postpartum depression that was eliminated through treatment over

the course of the case, and the condition that led to her children's removal—neglect and a dirty/unsafe home—was remedied. In this case, the evidence was that the appellant's mental illnesses are permanent and cannot be "cured," and that the condition leading to C.R.'s removal has not been remedied.