SLIP OPINION



Cite as 2016 Ark. App. 202

# ARKANSAS COURT OF APPEALS

DIVISION I
**No.** CV-15-1018

| | |
|---|---|
| CIERA ROBINSON | **Opinion Delivered** April 13, 2016 |
| APPELLANT | APPEAL FROM THE CONWAY COUNTY CIRCUIT COURT |
| V. | [NO. JV-14-01] |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN | HONORABLE TERRY SULLIVAN, JUDGE |
| APPELLEES | AFFIRMED |

## BRANDON J. HARRISON, Judge

Ciera Robinson appeals the Conway County Circuit Court's termination of her parental rights to her children D.D. and S.D. She argues that termination was not in her children's best interest and that it does not fulfill the purpose of termination under Ark. Code Ann. § 9-27-341(a)(3) (Repl. 2015). We affirm.

### I. *Facts*

The case began on 1 January 2014 when Robinson called the police to report that Bobby Ray Simmons, Jr., a celebrity, raped her in her sleep and was punishing her and other women. She also said, among other things, that she and Bobby Ray had a child together named Elijah but he was not born yet. She told the police that she had thought about ending her life. After police officers arrested Robinson for marijuana possession, the

Arkansas Department of Human Services (DHS) took emergency custody of D.D. and S.D. because the children lacked a caregiver. Robinson told the caseworkers that the children's father, Montana Dean, lived in Ohio and that she had obtained a protection order against Dean for allegedly molesting D.D. and S.D.

The circuit court adjudicated the children dependent-neglected in February 2014. Robinson was not present for the adjudication hearing. Robinson was present for a May 2014 review hearing. In the May review order, the circuit court wrote: "The court agreed to change the goal today based upon the testimony presented and the fact that mom has not complied since the children were removed on 1/1." The "concurrent plan of this case shall continue to be reunification. The goal is adoption or placement with a legal guardian/permanent custody." The court noted that Robinson had not visited the children since February and also observed:

> Ciera does not have an identification card. Ciera testified she is homeless and has been kicked out of shelters because Nicki Manaj [sic] is trying to kill her. She was in a mental hospital in Ohio. Admits she is bipolar and sees spirits.
>
> The father, Montana Dean, is not part of the case and has no significant contacts with his children.

In October 2014 the court entered an order terminating DHS's obligation to provide reunification services to Robinson. The court noted the testimony of the children's father, Montana Dean, that "Ciera sees spirits and has sudden mood swings," that they fought in the past, and that he was convicted of domestic abuse against her. According to Dean, Robinson left Ohio and did not contact him to tell him where the children were, and he recently found out the children were in DHS custody and came down for the hearing. The court wrote:

The Court found specifically that there is little likelihood that services will result in reunification due to the mother's mental instability in continuing to believe that nationally-known entertainers are trying to get her and rape her and that she is off her medication and believes that she does not need any. She has been without stable housing for most of the case and has been discharged from multiple shelters and spent two months in jail. She has had district court criminal cases in three separate counties since the case opened. The Court noted the therapist's statement that when the children are permanently placed somewhere, they will need long-term, intensive care with structure and stability and the Court believes Ciera cannot provide this. The Court also found that [the] children were subjected to aggravated circumstances due to abandonment. Ciera abandoned her children since the case has been opened for ten months and she has not visited her children since February and up until very recently, she made no attempts to reunify with them.

In short, the circuit court found that there was little likelihood that services would result in

reunification and concluded that aggravated circumstances were present.

In a permanency-planning order entered the same day the court explained that:

mindful of the available permanency planning dispositions and accordance with the best interest, health and safety of the juveniles does hereby determine the goal of the case shall be: authorizing a plan to place custody of the juveniles with a parent, guardian, or custodian. The court finds the parent, guardian, or custodian, is complying with the established case plan and orders of the Court, making significant measurable progress toward achieving the goals established in the case plan, and diligently working towards reunification or placement in the home of the parent, guardian, or custodian. Placement of the juveniles in the home of the parent, guardian, or custodian shall occur within a time frame consistent with the juveniles' developmental needs but no later than three (3) months from the date of the permanency planning hearing. The concurrent goal is adoption.

The Court finds the case plan, services and placement in therapeutic foster home does meet the special needs and best interest of the juveniles, with the juveniles' health, safety and educational needs.
. . . .

An ICPC home-study from Ohio was approved for Timothy and April Moore. Timothy is the uncle of Ciera. The court was very concerned about the family's low income level and that the father has criminal history fourteen years ago. The Court is concerned that the Moore's may not be financially able . . . to add two more children to their household due to their low income and since one of their own children is disabled and that takes a deep commitment from the

family. The home study did not include any mention of what type of services that will be provided to the juveniles and the Dean children's therapist stated they will need long-term services.

Montana Dean testified that he wants custody of the children but is not in a position to have custody of them. He lives with his mother in Toledo, Ohio, and makes $500.00 a week as an apprentice steel worker in Ohio. He said it may take two months to get stable housing. Montana has a criminal history. . . . The Court ordered ADHS to conduct a background check [on him]. . . . The Court also stated that if the Moore family is being pursued for custody, then Timothy Moore needs to come to Arkansas and meet with the children to develop a relationship and to understand their long-term counseling needs.

A second permanency-planning order was entered in February 2015. The circuit court determined the "goal of the case shall be adoption. Mother has not followed the case plan. She recently attempted suicide and is not receiving any help with her mental health issues." The court also explained:

The Father Montana Dean was not present at this hearing. His ICPC referral has been sent, but his criminal background checks have come back and he has extensive criminal convictions in his past. Among others, since 2008 he has been convicted on Disorderly Conduct, Menacing, Domestic violence against a family member, Reckless violation of a temporary protection order, and Resisting arrest. The caseworker testified Mr. Dean has not remained in touch with her since the last hearing. He contacted the referred therapist one time, but has not followed up since. The caseworker further testified that based on these issues, the Department will not recommend placing the juveniles with their father.

In April 2015, DHS filed a petition for termination of parental rights against Robinson and Dean, alleging several statutory grounds for termination were present, that DHS was "seeking to clear the juveniles for adoption," and that the children faced potential harm if custody was returned to their parents. The court held a termination hearing in July and August 2015; DHS abandoned its termination petition against Dean, but pursued the petition against Robinson.

The circuit court entered an order terminating Robinson's parental rights in September 2015. The court found, among other things, that the testimony of adoption specialist Monica Spencer was credible and that D.D. and S.D. "are highly adoptable." It reasoned that termination was in the children's best interest because the children had remained out of Robinson's custody for seventeen months and that Robinson's only contact with the juveniles was at a 27 April 2015 family-therapy session. In finding that clear and convincing evidence supported its decision to terminate Robinson's parental rights, the court wrote that Robinson's "refusal to acknowledge her mental illness, her refusal to take any prescribed medications, her arrest record, her continued bizarre claims and behaviors, and her suicide attempt during the case" showed that she was an unfit parent. The court explained that "although this is not the exclusive permanency planning option available, as the father's parental rights are not being terminated . . . the facts demonstrate how [D.D. and S.D.] would be at risk of potential harm if returned to the mother."

Robinson has appealed the termination order "and all adverse rulings made therein."

## II. *Discussion*

An order forever terminating parental rights must be based on clear and convincing evidence that termination is in the child's best interest and a statutory ground for termination exists. Ark. Code Ann. § 9-27-341(b)(3)(A)–(B) (Repl. 2015). "Best interest" includes consideration of the likelihood that the juvenile will be adopted and the potential harm caused by returning custody of the juvenile to the parent. *Donley v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 335, at 1.

We review cases involving the termination of parental rights de novo. *Griffin v. Ark. Dep't of Health & Human Servs.*, 95 Ark. App. 322, 236 S.W.3d 570 (2006). While we review the factual basis for terminating parental rights under a clearly erroneous standard, no deference is given to the circuit court's decision with regard to errors of law. *Id.*

Arkansas Code Annotated section 9-27-341 is titled "Termination of Parental Rights." Subsection (a)(3) states:

> The intent of this section is to provide permanency in a juvenile's life in all instances in which the return of a juvenile to the family home is contrary to the juvenile's health, safety, or welfare and it appears from the evidence that a return to the family home cannot be accomplished in a reasonable period of time as viewed from the juvenile's perspective.

Our court has interpreted this statute to allow termination of an unfit parent's rights when the children remain or return to the "family home" of a fit parent. *See Ross v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 660, 378 S.W.3d 253.

Other cases have interpreted "family home" narrowly. For example, in *Donley*, a mother argued that the circuit court should place her child permanently with her sister, who had custody of her child's younger sibling, instead of the court terminating her parental rights. 2014 Ark. App. 335. In other words, the circuit court had a less drastic measure of relative placement that could still fulfill the legislative goal of permanency for the child. But we rejected this argument holding that the termination statute (Ark. Code Ann. § 9-27-341) contains no preferential consideration for relative placement and that the termination statute should *not* be read "in conjunction with other statutory provisions of the juvenile code." *Id.*

In *Lively v. Arkansas Department of Human Services*, we reversed a court's order terminating a father's rights when the child remained in the mother's custody and the case closed. There, we wrote that the circuit court considered that the father's "drug use, mental instability, and criminal convictions posed a risk of harm to the children should they be returned to his custody" but it "did not address whether termination (rather than a less-drastic alternative, such as a no-contact order or supervised visitation) was in the children's best interest" given that the children benefited significantly from their father's financial support. 2015 Ark. App. 131, at 8–9, 456 S.W.3d 383, 389.

In *Crowley v. Arkansas Department of Human Services*, we rejected a father's argument that permanency could be achieved through a no-contact order instead of terminating his parental rights when the children were placed permanently with their mother. 2016 Ark. App. 66. We reasoned that when a parent has subjected his children to violence and abuse, termination of that parent's rights fulfills the purpose of Ark. Code Ann. § 9-27-341(a)(3).

Robinson does not challenge any statutory ground or the court's prior finding that her mental instability, delusions, and abandonment of the children constituted aggravated circumstances. She instead contends that termination is unnecessary and not in her children's best interest. According to Robinson, "the children were poised to be returned to their father's custody, and their mother, while suffering from mental illness, had not harmed them, had been diligent in her efforts to maintain a relationship with them, and had a very positive impact on the girls' otherwise negative behavior when she had contact with them." Permanency for her children need not be achieved "by employing the draconian approach of termination" but instead "should be handled as countless others like it are

handled, through an order of visitation, or even an order of no contact, which could be lifted at a later date." She argues that the state's termination of her parental rights does not fulfill the purpose the General Assembly intended under Ark. Code Ann. § 9–27–341(a)(3).

We affirm the circuit court's decision that termination of Robinson's parental rights was in the children's best interest and necessary to provide permanency for them. While Montana Dean's parental rights were not terminated at the hearing, there was no certainty that the children were going to be placed permanently with him. At the hearing's close, the court said, "I cannot do that [place the children with Dean] until I have a report, we are ahead of ourselves, until I have a report from the therapist, I don't know what's going on with these kids and that I know that dad—well, we are going, I am not going to do that at this time." Later it again said:

> The children can't be monitored I know in another state, but, I do not know what shape the children are in, whether they are physically ready [to go] . . . I know there is going to have to be services in place for them before I can consider dad as a placement[.]. . . He is going to have to have a plan in place up in Toledo such as in counseling, baby sitting arrangements, et cetera. I think he is an appropriate placement. The only thing holding back right now other than if the children are ready to go is this home study. . . . [I]f there is a domestic battery, you never can be placed or do we know? . . . [W]e will just see where we are in four months. We are not going to make any promises to anybody about anything.

The court was actively considering how it might place the children safely in their father's care, but there was no guarantee that permanency would be achieved by that means.

Robinson has no quarrel with the court's finding that her children are "highly adoptable" because she believes that "they will not need to be cleared for adoption in order to achieve permanency." She instead argues that she can help care for the children while they are in their father's custody. But it is not at all certain that the children would be

placed in their father's custody, and the court concluded that the children faced future harm if Robinson's rights were not terminated.

Robinson's therapist, Sharon Cummins, testified that Robinson faithfully attended therapy every other week for nine months. But, importantly, Cummins agreed that Robinson lacked insight and made no progress in recognizing the extent of her mental illness. While Robinson testified that she had lived in the same shelter for eight months, done hundreds of hours of community service, paid off large amounts of criminal fines, and bought presents for the children, she did not have a stable home to which the children could return. She was living in a temporary shelter at the time of termination. DHS could not find her during periods of the case. She did not visit the children for long stretches of time either. She started, but never finished, the court-ordered psychological examination and parenting classes. Her obsessions and/or hallucinations about celebrities continued throughout the case, and she would not take medication prescribed for her bipolar condition. Medical records were entered into evidence showing that Robinson had several severe mental-health diagnoses and that she had been in and out of inpatient mental-health facilities since she was a teenager.

Robinson may not have intentionally harmed her children, and could act as a competent parent at times, but overall she could not successfully engage in the case plan and guarantee her children's return. Her inability to recognize the dangers her mental illness posed supports the circuit court's conclusion of potential harm—meaning that there was no way to know with sufficient confidence that D.D. and S.D. would be safe in Robinson's custody. *See Rossie-Fonner v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 29, 388 S.W.3d

38 (affirming termination where parent had a lifelong history of serious mental illness and the nature of this illness was permanent and unpredictable and would therefore continue to present a serious risk of harm to children). Therefore the circuit court's conclusion that a termination of Robinson's parental rights was necessary and in her children's best interest was not clearly erroneous.

### III. *Conclusion*

We affirm the termination of Robinson's parental rights to D.D. and S.D.

Affirmed.

GLADWIN, C.J., and WHITEAKER, J., agree.

*Leah Lanford*, Arkansas Public Defender Commission, for appellant.

*Jerald A. Sharum*, County Legal Operations, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor children.