Cite as 2026 Ark. App. 154

# ARKANSAS COURT OF APPEALS
## DIVISION IV
### No. CV-25-98

|  |  |
|---|---|
| | Opinion Delivered March 4, 2026 |
| APRIL BRADLEY | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, EIGHTH DIVISION |
| APPELLANT | [NO. 60JV-24-259] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD | HONORABLE TJUANA BYRD MANNING, JUDGE |
| APPELLEES | AFFIRMED; MOTION TO WITHDRAW GRANTED |

**CINDY GRACE THYER, Judge**

April Bradley appeals a Pulaski County Circuit Court order terminating her parental rights to her three-year-old son, MC.[1] Bradley's counsel has filed a motion to withdraw representation and a no-merit brief pursuant to *Linker-Flores v. Arkansas Department of Human Services*, 359 Ark. 131, 194 S.W.3d 739 (2003), and Arkansas Supreme Court Rule 6-9 (2025), stating that there are no meritorious grounds to support an appeal. The clerk of this court made four unsuccessful attempts to mail to Bradley a certified copy of counsel's brief and motion to be relieved, informing her that she has the right to file pro se points for reversal under Arkansas Supreme Court Rule 6-9(i)(3). The packet was ultimately returned

---

[1]The father's parental rights have not been terminated and thus, he is not a party to this appeal.

to the clerk's office as undeliverable, and Bradley has not filed any pro se points. We have reviewed the record, and because we agree there are no issues of arguable merit presented, we affirm and grant counsel's motion to withdraw.

I. *Facts and Procedural History*

On February 20, 2024, the Arkansas Department of Human Services ("Department") received a safety request from an investigator with the Crimes Against Children Division of the Arkansas State Police after MC was treated in the emergency room for a laceration and a fractured nose. Bradley could not adequately explain MC's injuries but suggested they could have occurred when the child headbutted something or while she was holding the child during a physical altercation with her boyfriend, Steven Underwood.

After the discussion with Bradley regarding the incident, the Department implemented a safety plan whereby Bradley and MC would stay with the paternal grandmother, Sandy Reed, so that Bradley would not be in contact with Underwood. However, when the Department visited Reed's home, it was dirty and not environmentally appropriate for MC. As a result, a local pastor temporarily procured a hotel room for Bradley and MC and agreed to act as her support system. The Department further advised Bradley that she needed to obtain a protective order against Underwood.

At a team decision-making meeting, Bradley agreed to stay at a shelter with MC and obtain employment. She further agreed to allow MC to stay with her pastor until she removed her belongings from her home and obtained the protective order against Underwood. She was given three days to get her affairs in order, but she requested more

2

time. The Department repeatedly texted and called Bradley over the next eight days, but she did not respond. MC remained with the church pastor that entire time.

The Department ultimately removed MC from the home on March 6 because Bradley had refused to go to the shelter, had failed to obtain a protective order against Underwood, and had made no progress on making the home safe and livable. Bradley stipulated to probable cause for the removal at the probable-cause hearing on March 14, and a probable-cause order was entered on March 21.

After an adjudication hearing on April 25, the court adjudicated MC dependent-neglected due to failure to protect, unexplained injury, environmental neglect, and parental unfitness, as well as Bradley's unwillingness or inability to provide a safe and stable home, thereby placing MC at risk of harm. The goal of the case was determined to be reunification with a fit parent and a concurrent goal of adoption.

A review hearing was held on August 6. The court found that Bradley was only in partial compliance with the case plan. The court had previously ordered Bradley to have safe, stable housing; submit to a hair-follicle drug test; and attend parenting classes and mental-health counseling. Although there was evidence that the appropriate referrals had been made and Bradley testified that she had submitted to a drug test and had started counseling, there was no documentation that Bradley had availed herself of those services. The court had also ordered Bradley to obtain an order of protection against Underwood, but Bradley had not complied with the court's instructions. The goal of the case remained reunification.

3

That same day, the Department and the attorney ad litem ("AAL") filed a joint petition for termination of parental rights, claiming that it was in MC's best interest that Bradley's parental rights be terminated. As grounds for termination, the petition alleged as to Bradley (1) aggravated circumstances—little likelihood of successful reunification; (2) prior involuntary termination of a sibling of the juvenile; (3) that the child had been abandoned; and (4) subsequent other factors. This petition also sought termination of the parental rights of MC's legal father, Paul Bradley.

On September 19, a hearing was held on several pending motions. At that hearing, the court found Justin McGinty to be MC's legal and biological father and, accordingly, dismissed Paul Bradley from the case. The court then granted the Department's voluntarily dismissal of itself as a joint petitioner in the pending petition for termination of parental rights, granted the AAL's motion for continuance, and ordered that the Department vet McGinity before any potential placement.

On September 24, the AAL filed a separate petition for termination of parental rights as to Bradley alone. The petition once again alleged that termination of parental rights was in MC's best interest and listed subsequent other factors, aggravated circumstances, and prior involuntary termination of parental rights as grounds for termination.

At the October 24 termination hearing, adoption specialist Kienda McFadden testified that she ran a data match using MC's characteristics and that the search returned 333 potential adoptive resources, indicating that MC was likely to be adopted. Sandra Mathis, Bradley's landlord, testified that Bradley owed $9,450 in back rent; the utilities were

off; Bradley had not maintained the property; and the home was currently uninhabitable. She stated that she had not evicted Bradley because she felt sorry for her.

Bradley also testified at the hearing. She admitted that the house she was renting was unlivable; that she owed back rent (although not as much as Mathis claimed); that she had pending criminal charges against her in Pulaski County for which she expected to receive probation; that she had active arrest warrants from Indiana; that she had not started domestic-violence classes; and that she had not progressed beyond supervised visits with MC. She claimed that she was currently employed; that she had submitted to a drug test; and that she had obtained a protective order against Underwood. However, she did not or could not provide any documentation that she had obtained a protective order, nor did she present any documentation that she had attended any parenting classes or counseling sessions.

As for her relationship with Underwood, Bradley initially claimed she had not spent any time with him after she alleged that he may have injured MC in March. However, the Department introduced a phone call from Bradley to an unnamed male caller in April initiated while she was incarcerated. In that call, it was clear that Bradley and the unnamed caller were in an intimate and romantic relationship. Although this phone call occurred shortly after MC's removal, Bradley denied she was in a romantic relationship with Underwood at the time of the call. She later admitted that she had had to call the police on Underwood several times since MC's removal but claimed she had not seen Underwood since June. When questioned about calls to the police regarding Underwood in June and July, she claimed she could not remember making the calls.

5

Bradley was also questioned about four other recorded inmate calls in September 2024. In one, Bradley informed an unnamed male caller that she had been having weird dreams. When the unnamed caller indicated that it was probably because she was "coming down off dope," Bradley stated, "I know. I've been sleeping non-stop." Even though the recording of this admission was played at the hearing, Bradley denied having "funny dreams" or being on drugs. In another call, Bradley was heard telling an unnamed male caller that McGinty was going to let her have MC back if she got a house and got her "head out of [her] ass." In the third call, Bradley informed the caller that she wanted to quit doing dope when she was released; however, at the hearing, Bradley denied telling anyone that. In a fourth call, Bradley giggled and told the caller that she was high on speed. The caller stated he thought Bradley had wanted to quit, and Bradley responded that she still intended to quit. The caller then admonished her that she should not be getting high in jail.

In each of the four calls, Bradley told the unnamed male caller that she loved him. Bradley claimed to be in a relationship with Travis Hall in September when those calls were made but denied they were in a relationship in April when the first phone call was recorded.

Finally, in a fifth phone call, Bradley told the caller that she did not want to take her seizure medication because she was afraid it would make her gain weight. She acknowledged at the hearing, however, that it was important to stay on her seizure medication if she was going to be in charge of a young child.

Despite the foregoing, Bradley claimed that she was drug-free; she could obtain stable and suitable housing quickly; and her pending charges would not prevent her from taking

6

custody of MC. She stated that she had bonded with MC and that with additional time, she believed she could successfully bring MC home.

Sergeant Jessica Ezell with the Pulaski County Regional Detention Facility was in charge of maintaining jail call logs, and she authenticated the recorded phone calls made by Bradley while incarcerated.

Mahogany Smith, the caseworker, testified that the Department had made all the required referrals, but Bradley had not cooperated and that her emails and texts to Bradley would go unanswered. Smith testified that, as of the date of the hearing, Bradley had not provided her with proof of income or of safe and stable housing (or potential housing); the home Bradley currently rented was without utilities and appeared abandoned; and she was unsure where Bradley was currently residing. She also did not have any evidence that Bradley had complied with obtaining the court-ordered hair-follicle test and testified that Bradley appeared to have unresolved drug issues. Smith also expressed concern about Bradley's romantic relationships and the fact she had not provided any evidence of taking any legal precautions to protect MC from domestic abuse. Because Bradley had not engaged with the services that had been ordered and had not demonstrated any improvements on her own, Smith did not believe that adding more services or providing her with more time would result in a successful reunification.

The last witness was Justin McGinty. He testified that it was "probably" in MC's best interest that Bradley's parental rights be terminated. He stated that he believes Bradley wants to be a good mother but noted that she had been unable to achieve reunification with any

of her other children. He testified that he believed drugs would be her downfall every time. He also testified that Bradley's testimony had not been entirely truthful at the hearing that day; that he believed the person in the first recorded phone call was Underwood; that Bradley had told him that Underwood accidentally hit MC during the altercation with Bradley; and that Bradley could also be explosive and violent at times.

After hearing all the evidence, the circuit court entered an order terminating Bradley's parental rights. The court found that the AAL had proved by clear and convincing evidence all the grounds for termination alleged in the petition and that termination was in MC's best interest. Specifically, if MC returned to Bradley, he "would be at potential risk of drug exposure, housing instability, neglect due to exposure to other unvetted partners as she admits to being involved with yet another man that [the Department] is not aware of and not vetted." The court further found credible McGinty's testimony regarding Bradley's toxic and violent behavior toward him.

Bradley timely appealed the court's order, and counsel has filed a no-merit brief and motion to withdraw.

## II. *Discussion*

In dependency-neglect cases, if, after studying the record and researching the law, appellant's counsel determines that the appellant has no meritorious basis for appeal, then counsel may file a no-merit petition and move to withdraw. The petition must include an argument section that lists all adverse rulings that the parent received at the circuit court

8

level and explain why each adverse ruling is not a meritorious ground for reversal. Ark. Sup. Ct. R. 6-9(j)(1)(A).

Counsel, here, addresses four clearly adverse rulings—the termination decision and rulings on three hearsay objections—and three other objections for which there was either no ruling or the need for the ruling was later obviated. Each will be discussed in turn.

## A. Termination

A circuit court's order terminating parental rights must be based on findings proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3) (Supp 2023). Clear and convincing evidence is defined as that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Posey v. Ark. Dep't of Health & Human Servs.*, 370 Ark. 500, 262 S.W.3d 159 (2007). On appeal, the appellate court reviews termination-of-parental-rights cases de novo but will not reverse the circuit court's ruling unless its findings are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the circuit court to judge the credibility of witnesses. *Id.*

In order to terminate parental rights, a circuit court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child,

caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii). The order terminating parental rights must also be based on a showing of clear and convincing evidence as to one or more of the grounds for termination listed in section 9-27-341(b)(3)(B). However, only one ground must be proved to support termination. *Reid v. Ark. Dep't of Hum. Servs.*, 2011 Ark. 187, 380 S.W.3d 918.

Although the circuit court here found multiple statutory grounds for termination, only one ground is necessary to support the termination. *See Brown v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 303, 521 S.W.3d 183. One of the statutory grounds found by the circuit court in the instant case was that, under Arkansas Code Annotated section 9-27-341(b)(3)(B)(ix)*(a)(4)(A)*, Bradley had previously had her parental rights involuntarily terminated as to another child.

At the termination hearing, the Department introduced two prior termination orders—an October 2019 order from Indiana that terminated Bradley's parental rights to two children and an October 2022 order from Arkansas terminating her parental rights to a third child. Because this statutory ground was conclusively proved at the termination hearing, there can be no meritorious challenge to the statutory-ground element of the termination statute.

In addition to finding the existence of at least one statutory ground to support the termination of parental rights, a court must also find that such termination is in the child's best interest, taking into consideration two statutory factors: (1) the likelihood of adoption if parental rights are terminated and (2) the potential harm caused by continuing contact

with the parent. Ark. Code Ann. § 9-27-341(b)(3)(A). Here, the court considered both statutory factors in light of the overall evidence, finding that termination was in MC's best interest. Counsel contends that there are no issues of arguable merit for reversal in challenging this best-interest finding. We agree.

Regarding adoptability, the Department's adoption specialist testified that she ran a data match with MC's characteristics, that there were 333 potential adoptive resources and that MC was likely to be adopted. This court has long held that the testimony of a caseworker or an adoption specialist that a child is adoptable is sufficient to support an adoptability finding. *Gonzales v. Ark. Dep't of Hum. Servs.*, 2025 Ark. App. 496, 725 S.W.3d 778; *Coston v. Ark. Dep't of Hum. Servs.*, 2024 Ark. App. 413, 698 S.W.3d 647; *Strickland v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 608, 567 S.W.3d 870. Thus, there was sufficient evidence that the circuit court had considered the likelihood of adoptability in accordance with Arkansas Code Annotated section 9-27-341(b)(3)(A) in finding that MC is adoptable. Accordingly, there is no meritorious challenge to this finding.

Regarding potential harm, the circuit court is not required to find that actual harm would result or to affirmatively identify a potential harm. *Ross v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 503, 529 S.W.3d 692. Potential harm must be viewed in broad terms, and "potential" necessarily means that the court is required to look to future possibilities. *Id.*

Here, the court found that MC would be at potential risk of future instability, substance exposure, and exposure to domestic violence if returned to Bradley. Here, the Department presented evidence of Bradley's housing instability as shown by the evidence

11

that her house lacks working utilities and is currently uninhabitable; her continued drug usage, even while incarcerated; her failure to complete her domestic-violence classes despite having been in a physically abusive relationship; and her failure to comply with practically all the court's orders other than visitation. This is in addition to all the services she was provided in the other prior cases that also resulted in termination. This court has frequently held that continued drug use, domestic violence, and instability demonstrate potential harm sufficient to support a best-interest finding in a parental-rights-termination case. *See, e.g.,* *Beaird v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 415, 585 S.W.3d 172; *Murphy v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 426, 560 S.W.3d 465; *Robinson v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 262, 520 S.W.3d 322; *Rossie-Fonner v. Ark. Dep't of Hum. Servs.*, 2012 Ark. App. 29, 388 S.W.3d 38.

### B. Other Adverse Rulings

Finally, counsel notes that, in addition to the termination decision, she has reviewed the record for all rulings adverse to Bradley made by the circuit court on all objections, motions, and requests made at the termination hearing in accordance with Arkansas Supreme Court Rule 6-9(j)(1)(A). In addition to the sufficiency to support termination, Bradley's counsel fully briefed and discussed all but one adverse ruling. She even discussed three other objections from which either no ruling was obtained or the ruling was later obviated.

Three of the adverse rulings addressed by counsel were related to hearsay objections to Bradley's testimony regarding what she had been told by the drug-screening company and

by her caseworker about being referred for services and what her probation officer told her about her pending criminal charges. We review evidentiary rulings under a manifest-abuse-of-discretion standard, and we will not reverse absent a demonstration of prejudice. *Joslin v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 273, 577 S.W.3d 26. After reviewing the record, we agree with counsel that the circuit court's rulings were correct and that the circuit court did not abuse its discretion. Moreover, we have held that when an adverse ruling could not have changed the outcome of the proceeding and resulted in no prejudice, there can be no meritorious challenge to the adverse ruling. *Mayer v. Ark. Dep't of Hum. Servs.*, 2025 Ark. App. 51. Here, even if there was an error with the adverse rulings identified by counsel, the error would nevertheless be harmless considering the other evidence presented supporting termination of Bradley's parental rights as already discussed above.

The other adverse ruling addressed by counsel relates to the circuit court's denial of a motion for continuance of the termination hearing because Bradley was not present when the case was called. However, Bradley was represented by counsel throughout the hearing, she appeared by Zoom shortly after the hearing began and even testified at the hearing. Thus, the need for a continuance was obviated.

As for the one adverse ruling not fully briefed, our supreme court has held that counsel's failure to address every adverse ruling will not prohibit us from granting counsel's motion to withdraw and affirming a termination order when the ruling clearly did not constitute reversible error. *Lewis v. Ark. Dep't of Hum. Servs.*, 364 Ark. 243, 217 S.W.3d 788 (2005). The adverse ruling that Bradley's counsel failed to discuss—her request for more time

to complete the case plan—clearly does not constitute reversible error. Bradley has never been in full compliance with the case plan and has still not addressed her substance-abuse issues despite services being provided since at least 2018 when two of her children were removed from her care in Indiana. Even were she to begin services now, this court has consistently held that eleventh-hour attempts to comply with court orders do not outweigh prior noncompliance and need not be credited by the circuit court. *Watts v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 339, 669 S.W.3d 831. A parent's past behavior is often a good indicator of future behavior, and a child's need for permanency and stability may override a parent's request for more time to see if the parent can change his or her behavior. *Id.*

The goal of the termination-of-parental-rights statute is to provide permanency in a child's life when returning the child to the family home is contrary to the child's health, safety, or welfare, and the evidence demonstrates that a return to the home cannot be accomplished in a reasonable period of time as viewed from the child's perspective. Ark. Code Ann. § 9-27-341(a)(3). A child's need for permanency and stability may override a parent's request for more time to improve the parent's circumstances. *Morton v. Ark. Dep't of Hum. Servs.*, 2015 Ark. App. 388, 465 S.W.3d 871. Under the facts and circumstances presented in this case, MC's need for permanency and stability outweighed Bradley's request for additional time, and the circuit court did not err in denying her request.

III. *Conclusion*

Having carefully examined the record and the no-merit brief, we hold that Bradley's counsel has complied with the requirements for a no-merit termination-of-parental-rights

appeal and that the appeal is wholly without merit. Accordingly, we grant counsel's motion to withdraw and affirm the termination order.

Affirmed; motion to withdraw granted.

HARRISON and TUCKER, JJ., agree.

*Leah Lanford*, Arkansas Commission for Parent Counsel, for appellant.

One brief only.